**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 19 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff-Appellee,

v.

MESA RITH,

　　　　Defendant-Appellant.

No. 97-4138

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 96-CR-36 G)

---

L. Ronald Jorgensen, Sandy, Utah, for Appellant.

Leshia M. Lee-Dixon, Assistant United States Attorney, (David J. Schwendiman, United States Attorney, with her on the brief), United States Attorney's Office, Salt Lake City, Utah, for Appellee.

---

Before **BRORBY, McKAY,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

　　　A jury found Mesa Rith guilty of unlawful possession of an unregistered

sawed-off shotgun in violation of 26 U.S.C. § 5861(d). Rith challenges his

conviction on the following grounds: (1) he revoked the consent his parents had given to search the house and, even if valid, their consent did not extend to his bedroom; (2) all incriminating statements should have been suppressed because they were involuntary, he was in custody for purposes of *Miranda*, and some statements constituted "fruit of the poisonous tree"; (3) his Sixth Amendment right of confrontation was violated by the admission of a certificate showing nonregistration in the National Firearms Registration and Transfer Record; (4) the evidence was insufficient to support a conviction; and (5) the trial judge erred by instructing the jury that they not be "governed by sympathy, prejudice, or public opinion." This court exercises jurisdiction under 28 U.S.C. § 1291 and **affirms** the judgment of the district court.

## I. Background

Officer Mikkel Roe of the West Valley Police Department was dispatched to a residence in West Valley City, Utah. Officer Roe was informed en route that Sam Rith and his wife were concerned about firearms they had seen their son carry into their home. The address to which Officer Roe was dispatched was the residence of friends of the Riths, a few blocks away from the Rith family home. Sam Rith told Officer Roe that he and his wife had seen their son, Mesa Rith

("Rith"), carry guns into their home and conceal one in the garbage can outside the home. Fearful of guns and afraid that their son was involved in a gang, the Riths requested that Officer Roe check the home and ascertain if the guns were stolen. Officer Roe requested that Detective Terry Chen join him because Detective Chen had experience as a gang task force officer. Upon Detective Chen's arrival, Sam Rith again gave permission to the officers to search his home for the guns. Fearing confrontation with his son, Sam Rith declined to accompany the officers during the search. Instead, he gave the officers a house key so that no damage would be done to the house in the event they were not otherwise allowed entry. During his discussion with the officers, Sam Rith told the officers that Mesa Rith was eighteen years of age and was not paying rent.

When the officers arrived at the Rith home, they encountered Rith on the porch talking to two Midvale, Utah police officers who were conducting an unrelated investigation. Detective Chen indicated Rith's father had informed them that Rith had brought guns into the house and that they were there to search for the guns. Rith told the officers that they could not search the house and he asked them for a search warrant. When Officer Chen showed Rith the house key Rith said, "Okay, come in."

Detective Chen spoke with Rith in the kitchen, told him again that they knew he had brought illegal guns into the house, repeated that they had

permission to be there, and asked Rith where the guns were hidden. Rith told the officers that he only had one gun and that it was in his bedroom, downstairs, under the mattress. Officer Roe, Detective Chen, and a Midvale officer searched the bedroom and found a loaded sawed-off shotgun underneath Rith's mattress. They also found in Rith's open closet a shotgun round, a BB gun, and a checkbook for an account in someone else's name.

Detective Chen returned to the kitchen and confronted Rith with the shotgun. Rith stated that he knew it was illegal to possess a sawed-off shotgun and that the guns were probably stolen by the person who had given them to him. Officer Roe, who had gone outside and found a rifle in the garbage can, returned to the kitchen and read Rith his *Miranda* rights. After Officer Roe confirmed that Rith understood his rights, Rith repeated that he knew it was illegal to possess a sawed-off shotgun and that the guns were probably stolen. The officers then arrested Rith for possession of stolen property and illegal weapons.

Testimony received during trial indicated that the barrel of the sawed-off shotgun measured 13 and 3/4 inches and its overall length was 21 3/4 inches, each 4 1/4 inches less than the lawful length. Evidence also showed that no firearm was registered to Mesa Rith in the National Firearms Registry and Transfer Records.

## II. Consent to Search the Rith Home

Rith argues that the evidence seized by the police during the search should have been suppressed for two reasons: (1) Rith revoked his parents' consent to search the home; and (2) the evidence failed to show that Rith's parents had authority to consent to a search of his bedroom.

The trial court's findings of fact are accepted by this court unless clearly erroneous, with the evidence viewed in the light most favorable to the government. *See United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir. 1990). Issues of law, such as whether consent was valid under the Fourth Amendment, are reviewed *de novo. See United States v. Flores*, 48 F.3d 467, 468 (10th Cir. 1995).

### A. Rith's Parents' Consent Was Not Revocable

Generally, consent to a search given by someone with authority cannot be revoked by a co-occupant's denial of consent, even if that denial is clear and contemporaneous with the search. In *United States v. Matlock*, the Supreme Court held that mutual use of property carries with it the risk that just one of the occupants might permit a search of the common areas. 415 U.S. 164, 172 n.7 (1974). Applying *Matlock*, this court has stated that "[i]f common authority is

established, the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search *in her own right*." *See McAlpine*, 919 F.2d at 1463 (emphasis added).

Rith argues that his claim to privacy is stronger because he, not his parents, was present at the time he refused to consent to the immediately ensuing search. According to Rith, consent by a third party to search is valid "only where the defendant [is] physically or constructively absent." To support this claim, Rith refers the court to a sentence in *Matlock* which states that "the consent of one who possesses common authority over premises or effects is valid as against the *absent, nonconsenting person* with whom that authority is shared." *Matlock*, 415 U.S. at 170 (emphasis added). The language and structure of the *Matlock* opinion refute such an interpretation. The language to which Rith refers is embedded in a discussion of cases in which the Court addressed issues previously undecided. Concluding its discussion of these cases, the Court stated its holding:

> These cases at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

*Id*. at 171. This unequivocal holding is unencumbered by the Court's earlier reference to the "absent, nonconsenting person." Furthermore, *Matlock* is uniformly interpreted as allowing a person with shared authority to grant effective consent to search the common premises despite the objections of the subject of the search. *See, e.g.*, *United States v. Morning*, 64 F.3d 531, 534-36 (9th Cir. 1995); *Lenz v. Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995); *United States v. Donlin*, 982 F.2d 31, 33 (1st Cir. 1992); *United States v. Bradley*, 869 F.2d 417, 419 (8th Cir. 1989); *J.L. Foti Construction Co. v. Donovan*, 786 F.2d 714, 716-17 (6th Cir. 1986); *United States v. Bethea*, 598 F.2d 331, 335 (4th Cir. 1979).

Under *Matlock* and its interpretive progeny, Rith had no expectation of privacy that negated his parents' consent to a search of their home. To hold otherwise would undermine the gravamen of *Matlock*: "any of the co-habitants has the right to permit the inspection *in his own right* and . . . the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7 (emphasis added).

**B. Rith's Parents Had Authority to Consent to a Search of Rith's Bedroom**

That Rith's parents were authorized to grant effective consent to the search of their home does not fully resolve Rith's challenge. It is the government's

burden to establish by a preponderance of the evidence that Rith's parents had authority to consent to the search of Rith's bedroom. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *McAlpine*, 919 F.2d at 1463. In order to have authority to grant effective consent, *Matlock* requires "mutual use of the property by persons generally having joint access or control for most purposes." 415 U.S. at 172 n.7.

Rith urges this court to use the D.C. Circuit's interpretation of *Matlock*.[1]  In

*United States v. Whitfield*, the D.C. Circuit required proof both of mutual use and

joint access in order for the third party to have authority to consent to a search.

939 F.2d 1071, 1074 (D.C. Cir. 1991).  Applying this test to the facts, the

*Whitfield* court held that the police had sufficient basis to believe that a mother

[1]Though not mentioned by Rith, the Second and Fourth Circuits have also interpreted *Matlock*. In *United States v. Davis*, the Second Circuit established the following test to meet the requirements of *Matlock*: the third party (1) had access to the area searched, and (2) a common authority over the area, a substantial interest in the area, or permission to gain access to the area.  967 F.2d 84, 87 (2d Cir. 1992).  Using this test, the Southern District of New York in *United States v. Perez* concluded that a father had authority to consent to a search of his son's bedroom and the closed containers therein, even though the son had been the sole occupant and user of the bedroom for four years, the father did not use the bedroom for any purpose, and he had never accessed the personal effects in his son's closets.  948 F. Supp. 1191, 1201 (S.D.N.Y. 1996).  The determining factor for the court was that the father led the officers into the room and removed a suitcase from his son's closet, indicating that he had "at a minimum, permission to gain access to the bedroom." *Id*. at 1200.  The court also noted that there was no evidence the son had ever prohibited his father from examining the contents of his bedroom. *See id*.

Unlike the Second and D.C. circuits, the Fourth Circuit requires proof that the third party has common authority over, general access to, or mutual use of the premises under circumstances that make it reasonable to believe that the third party has the right to permit a search. *See United States v. Block*, 590 F.2d 535, 539-40 (4th Cir. 1978).  The *Block* court held that a mother had both the actual authority and a reasonable appearance of authority to consent to a search of the bedroom of her twenty-three year old son flowing from the "normal free access that heads of household commonly exercise in respect of the rooms of family member occupants." *See id*. at 541.  The court held, however, the mother did not have the authority to consent to the search of her son's footlocker, albeit in his bedroom, because there is a greater expectation of privacy in a locked container. *See id*.

generally had joint access to her twenty-nine year old son's bedroom because the room was unlocked and because the mother lived in the house. *See id*. But, the court held, there was insufficient proof of mutual use of the bedroom, such as evidence that the mother cleaned her son's room, visited with him there, stored possessions in his room, watched television there, or made any use of the room. *See id*. The court declined to find that there was mutual use merely because a parent-child relationship existed and concluded that there was no evidence to negate the defendant's exclusive use of his bedroom. *See id*. at 1075.

The Tenth Circuit applied *Matlock* in *McAlpine*. *See* 919 F.2d at 1463. The issue was whether a woman held against her will in the defendant's residence for two months possessed the authority to consent to a search of his residence. The court essentially restated *Matlock*'s test: "the government bears the burden of proving by a preponderance of the evidence that the consenter had mutual use of the property searched by virtue of her joint access to it, or control for most purposes over it." *Id*. at 1463. Applying this test, the court found that the captive woman had authority to consent because she slept in the back room where the guns were found and she had personal possessions throughout the trailer. *See id*. at 1464; *see also United States v. Iribe*, 11 F.3d 1553, 1556 (10th Cir. 1993) (employing same standard as *McAlpine* and finding that by virtue of being a co-resident, the third party had joint access to the house).

-10-

This panel clarifies the test used in *McAlpine* and rejects Rith's argument that the *Whitfield* test be used. Rather than requiring mutual use from joint access and control, the *McAlpine* test is disjunctive: a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.[2] Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search. For example, in *McAlpine*, a woman held captive by the defendant in his home had authority to consent to the search simply by virtue of her joint access. Uncontradicted evidence showed that

---

[2] *United States v. Falcon* interpreted *Matlock* differently than *McAlpine*, but for the following reasons this court declines to follow *Falcon*. 766 F.2d 1469, 1474 (10th Cir. 1985). The *Falcon* court stated that *Matlock* required "the consenting party [to have] *both* access to the area *and* either a substantial interest in or common authority over the property." *See id.* (emphasis added). This language, however, is dicta and creates no binding precedent. Critically, the defendant in *Falcon* conceded that the third party had authority to consent to a search. The issue in *Falcon* was whether valid consent to search is distinguishable from valid consent to seize. Citing Supreme Court precedent, the court held that for purposes of valid third-party authority, there is no distinction between the two. Consequently, though seemingly part of the analysis, the *Matlock* discussion is gratuitous.

Rith relies upon *United States v. Salinas-Cano* in support of his effort to have the Tenth Circuit adopt the *Whitfield* test. 959 F.2d 861 (10th Cir. 1992). *Salinas-Cano* stated that *Matlock* requires "both shared use and joint access or control of a container in order to support third party consent." *See id.* at 864. We construe this language and *Salinas-Cano* generally to be consistent with *McAlpine*'s interpretation of *Matlock* in the disjunctive.

-11-

she was free to access the rooms of the home because she slept where the guns were found and her personal effects were found throughout the residence.

Unlike the fact-intensive inquiry of mutual use, control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party.[3] If a relationship creates such a presumption of control and is unrebutted, the third party has authority to consent to a search of the property.

Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships. *See, e.g.*, *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997) ("A third-party consent is also easier to sustain if the relationship between the parties—parent to child here, spouse to spouse in others—is especially close."); *United States v. DiPrima*, 472 F.2d 550, 551 (1st Cir. 1973) ("[E]ven if a minor child, living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents."). In contrast, a simple co-tenant relationship does not create a

---

[3] Although the *McAlpine* court stated that the appropriate *Matlock* inquiry is the relationship between the consenter and the property searched, not the relationship between the consenter and the defendant, the court conceded that "the character of the relationship between the consenter and the defendant may bear upon the nexus between the consenter and the property." 919 F.2d 1461, 1464 (10th Cir. 1990).

presumption of control and actual access would have to be shown.  *See United States v. Duran*, 957 F.2d 499, 505 (7th Cir.1992) ("Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms without explicitly making this expectation clear to one another."); *United States v. Heisman*, 503 F.2d 1284, 1287 (8th Cir. 1974) (although defendant's room did not have a door or a lock, co-tenant did not have authority to consent to a search of defendant's private areas).  The difference between a husband-wife or parent-child relationship and a co-tenant relationship is that a husband-wife or parent-child relationship raises a presumption about the parties' reasonable expectations of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship.[4]  *See, e.g., Ladell*, 127 F.3d at 624 ("Third-party consents to search the property of another are based on a reduced expectation of privacy in the premises or things shared with another.").

Two caveats are important.  First, in determining whether a particular relationship raises a presumption of control for most purposes, *McAlpine*

---

[4] Consistent with *Matlock*'s admonishment that this inquiry into authority to consent to a search does not rely upon notions of property law, a relationship giving rise to a presumption of control cannot be premised on the general proprietary interest in the home of one of the parties. *See Matlock*, 415 U.S. at 172 n.7. Thus, a mortgage or lease in the parents' name would not be sufficient to confer authority to consent to a search of a child's bedroom. *See, e.g., Maxwell v. Stephens*, 348 F.2d 325, 336 (8th Cir. 1965) (finding that mother had authority to consent to a search independent of her proprietary interest in the house).

admonishes that authority to search is premised on a "practical understanding" of the way parties have access to and share the searched property. *See McAlpine*, 919 F.2d at 1463. Second, while husband-wife or parent-child relationships give rise to a presumption of control for most purposes over the property, that presumption may be rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room. For example, evidence that the defendant paid rent to the third party would tend to show a landlord-tenant relationship. *See Stoner v. California*, 376 U.S. 483, 489-90 (1964); *see also DiPrima*, 472 F.2d at 551 (noting that payment of rent may weigh in favor of defendant's claim of exclusive right to room). Other examples include a lock on the bedroom door or an agreement, explicit or implicit, that the third party never enter a particular area. *See Morning*, 64 F.3d at 536 ("A defendant cannot expect sole exclusionary authority unless he lives alone, or at least has a special and private space within the joint residence."); *United States v. Kinney*, 953 F.2d 863, 866 (4th Cir.1992) (third party did not have authority to consent to search of defendant's locked closet).

In this case, there are insufficient factual findings that Rith's parents had joint access to his bedroom to support a conclusion of their authority to consent to a search of the room. There are no findings that Rith's parents visited with him

in his room, cleaned his room, or otherwise went into Rith's room uninvited. Furthermore, the district court chose not to infer that Rith's parents had access on the basis of their knowledge of hidden guns in his room.

The government has, however, shown that Rith lived with his parents and was not paying rent. Although Rith was eighteen years old, these facts raise a presumption of control for most purposes by Rith's parents over the entire home and thus they could have accessed Rith's room without his consent. There is no evidence to rebut this presumption: no lock on Rith's bedroom door; no agreement with Rith's parents that they not enter his room without his consent; no payment of rent. Because the presumption of control is unrebutted, Rith's parents had authority to consent to the search of Rith's bedroom.[5]

### III.  Suppression of Incriminating Statements

Rith argues that the statements he made both before and after being read his *Miranda v. Arizona* rights should have been suppressed.  384 U.S. 436 (1966). Because the statements that Rith made after being confronted with the sawed-off

---

[5] Because Rith's parents had actual authority to consent to the search of his bedroom, analysis of apparent authority to consent is unnecessary. *See Illinois v. Rodriguez*, 497 U.S. 177 (1990) (holding that Fourth Amendment is not violated when officers enter without a warrant if they reasonably, albeit erroneously, believe that the third party has authority to consent to the entry).

shotgun but before he was read his *Miranda* rights were suppressed, Rith's argument is directed to the statements made before he was confronted with the sawed-off shotgun and those made after he was confronted with the shotgun and *Mirandized*. Rith claims that he was in police custody prior to being read his *Miranda* rights and, even though he was eventually read these rights, the proximity of his suppressed pre-*Miranda* incriminating statements to his post-*Miranda* incriminating statements renders the latter "fruit of the poisonous tree." He also argues that all of his statements were involuntary, in violation of the Fifth Amendment.

Upon their entry into the Rith home, the officers requested that Rith's brothers wait in the living room. They asked Rith to sit at the kitchen table because Detective Chen wanted to speak with him. Detective Chen stated to Rith that he "knew that [Rith] had brought some illegal guns into the house" and he repeated that the police had permission from Rith's parents to search the house for the guns. Officer Chen then asked Rith where the guns were located. Rith stated that he had "only one gun" and that it was in his bedroom under the mattress. He proceeded to tell the police which bedroom was his.

The officers returned to the kitchen and confronted Rith with the sawed-off shotgun. Prior to receiving his *Miranda* warning, Rith responded affirmatively to Detective Chen's question whether he knew that the possession of an illegal

sawed-off shotgun was a federal offense. He then told the officers that the guns, given to him by a friend, were probably stolen. Officer Roe proceeded to advise Rith of his *Miranda* rights, and Rith again identified the source of the guns and indicated that he thought them stolen. The officers then arrested Rith, approximately forty-five minutes after their initial entry.

The district court concluded that the totality of the circumstances established Rith was not in custody until after he had been confronted with the shotgun. *See United States v. Rith*, 954 F. Supp. 1511, 1517-18 (D. Utah 1997). The district court affirmed the magistrate judge's recommendation that the incriminating statements made after Rith was confronted with the shotgun but before he was *Mirandized* should be suppressed. *See id.* at 1518. The district court then ruled that the statements Rith made after being *Mirandized* were voluntary and therefore admissible. *See id.* at 1518.

In *Miranda v. Arizona*, the Supreme Court stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. 436, 444 (1966). In a subsequent case, the Court clarified that a determination of whether an individual was in custody must be made on the totality of the circumstances, and the ultimate inquiry "is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the

degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The determination of custody is reviewed *de novo*, though this court defers to the district court's findings of historical fact and credibility determinations. *See United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998).

This court agrees with the district court's conclusion that under the totality of the circumstances, Rith was not in police custody until the point at which he was confronted with the illegal shotgun. Rith was questioned while at home and the officers had authority to be there, despite Rith's desires to the contrary. *See Erving L.*, 147 F.3d at 1247 (noting that suspects are less likely to be found to have been in custody for *Miranda* purposes if they were interviewed in their own homes). The district court found that the officers did not draw their weapons, handcuff Rith, or otherwise impose physical restraint upon him. *See Rith*, 954 F. Supp. at 1517. The officers' questions were not harassing nor especially prolonged. Granted, there were five officers in the home at the time of the questioning; Rith was asked to sit at the kitchen table because Detective Chen had some questions to ask; and he was not told that he did not have to answer the questions. None of these factors, alone or aggregated, however, overcomes our conclusion that a reasonable person in Rith's position would have felt free to leave. The officers' presence, conduct, and questioning did not rise to the level

of a restraint of freedom of movement of the degree associated with a formal arrest.

Rith next argues that his post-*Miranda* incriminating statements were involuntary because of their proximity to his pre-*Miranda*, albeit suppressed, incriminating statements. In particular, Rith points to this court's decision in *United States v. Perdue*, in which, he argues, this court held that incriminating statements made after the defendant was given his *Miranda* rights were involuntary because of the proximity of those statements to incriminating statements made before he was given his *Miranda* rights. 8 F.3d 1455 (10th Cir. 1993).

*Perdue*, however, is inapposite because of the Supreme Court's decision in *Oregon v. Elstad*. 470 U.S. 298 (1985). In *Elstad*, the Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 313. The Court also noted with approval that "[o]f the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have . . . recognized that [the] requirement of a break in the stream of events is inapposite." *Id.* at 310 (citations omitted).

The *Perdue* court expressly declined to apply *Elstad* because the defendant's first confession in *Perdue* was involuntary. *See Perdue*, 8 F.3d at 1468 n.7. Thus, the *Perdue* court properly considered the effect of the first coerced confession on the voluntariness of the second confession. *See id.* at 1467-68. *Perdue* is relevant here only if Rith's pre-*Miranda* incriminating statements were involuntary; otherwise, *Elstad* applies and Rith may not avail himself of the fruit of the poisonous tree argument.

The question of voluntariness is reviewed *de novo*, crediting the district court's findings of fact unless clearly erroneous. *See United States v. Glover*, 104 F.3d 1570, 1580 (10th Cir. 1997). Whether a defendant's incriminating statements were made voluntarily must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne. *See Miller v. Fenton*, 474 U.S. 104, 116 (1985). Five factors are considered: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5)

whether the defendant was subjected to physical punishment." *Glover*, 104 F.3d at 1579.

At no point during the search was Rith threatened with or subjected to physical punishment by the officers, the questioning lasted no longer than forty-five minutes, and Rith was in the comfortable surroundings of his home. The record contains no evidence to suggest that Rith was susceptible to coercion because of his age, intelligence, or education. In fact, as the district court noted, Rith displayed his fortitude by demanding that the officers show him a search warrant before they could enter the house. *See Rith*, 954 F. Supp. at 1518. That Rith was not advised of his constitutional right is not at all dispositive and is but one factor to consider among others. The totality of the circumstances leads to the conclusion that all of Rith's incriminating statements were voluntary.[6]

Because we conclude that all of Rith's statements were voluntary, *Elstad* compels the conclusion that the administration of *Miranda* warnings prior to Rith's second set of incriminating statements met the requirements of the Constitution. Rith's fruit of the poisonous tree argument fails and the incriminating statements were properly admitted.

---

[6] The district court suppressed the first of Rith's incriminating statements merely because he had not been given the *Miranda* warnings, not because the statements were otherwise involuntarily given.

## IV. Sixth Amendment Right to Confrontation and Hearsay

26 U.S.C. § 5861(d) makes it unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." In its effort to prove that Rith failed to register the sawed-off shotgun in his possession, the government introduced into evidence a document signed by Bureau of Alcohol, Tobacco and Firearms Specialist David Marshall stating that "after a diligent search of the . . . [National Firearms Registration and Transfer Record], I have found no evidence that the firearm or firearms described below are registered to, or have been acquired by lawful manufacture, importation, or making by, or transfer to Mesa (NMN) Rith." Affixed to the document was a sealed certificate signed by Acting Chief of the National Firearms Act Branch Denise Brown certifying that David Marshall signed in his official capacity and that his signature was genuine.

Rith objected to the admission of this document [hereinafter "ATF certificate"] as hearsay and violative of the Confrontation Clause of the United States Constitution. The trial judge overruled his objection and received the certificate into evidence under Federal Rule of Evidence 803(10).[7] At the close

---

[7]Federal Rule of Evidence 803(10) allows for the admission of evidence showing an absence of public record or entry if the record, report, statement, or

(continued...)

of his case, Rith moved to dismiss the indictment pursuant to Rule 29, Federal Rules of Criminal Procedure, arguing that the government failed to meet its burden of proving the nonregistration of the weapon. After considering Rith's arguments and supporting documents, the trial judge denied the motion and submitted the matter to the jury. On appeal, Rith argues that his Sixth Amendment right to confront his accusers was denied by the admission of the ATF certificate. Rith's argument is two-fold: first, he was denied the opportunity to question the signatory, David Marshall; and second, the NFRTR lacks the reliability required by the Confrontation Clause.

Because Rith raises a constitutional claim, review of the trial court's admission of the ATF certificate is *de novo*. *See Bennett v. National Transp. Safety Bd.*, 66 F.3d 1130, 1136 (10th Cir. 1995). The trial court's finding of

---

[7](...continued)
data compilation was "regularly made and preserved by a public office or agency," and is accompanied by either a certification in accordance with rule 902 or testimony that a "diligent search failed to disclose the record, report, statement, or data compilation or entry." Rule 902(2) provides for self-authentication of documents not under seal.

The ATF certificate meets the requirements of the 803(10) exclusion from the hearsay rule. Congress assured that the NFRTR was "regularly made and preserved by a public office or agency" with 26 U.S.C. § 5841, which requires the Secretary of the Treasury to "maintain a central registry of all firearms in the United States . . . . This registry shall be known as the National Firearms Registration and Transfer Record." The ATF document was accompanied by certification which fulfilled the requirements of 902(2). The trial court's admission of the ATF certificate over the defendant's hearsay objection was proper.

-23-

reliability is also reviewed *de novo*. *See United States v. Joe*, 8 F.3d 1488, 1492 (10ᵗʰ Cir. 1993).

## A.  Inability to Cross-Examine the Declarant

The Sixth Amendment provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  A literal reading of the Confrontation Clause would seem to preclude all hearsay from being introduced as evidence against a criminal defendant.  Nevertheless, the Supreme Court has declined to impose such a reading.  In *White v. Illinois* the Court stated that "unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." 502 U.S. 346, 354 (1992).  The *White* Court proceeded to hold that it was unnecessary to prove unavailability of declarants of spontaneous declarations[8] and statements made in the course of receiving medical care.[9] *See id.* at 356-57.  Because the ATF certificate was not the product of a judicial proceeding, the government's decision to introduce the ATF certificate into evidence without putting Mr. Marshall on the stand is not assailable for failure to make him available or prove him unavailable. *See also*

---

[8] *See* Fed. R. Evid. 803(2).

[9] *See* Fed. R. Evid. 803(4).

*Earnest v. Dorsey*, 87 F.3d 1123, 1130 n.5 (10th Cir.) (citing *White* for its limitation of availability requirement), *cert. denied*, 117 S. Ct. 527 (1996).

Additionally, there is no evidence in the record that the defendant did not have the opportunity employ his Sixth Amendment right of Compulsory Process[10] to subpoena Mr. Marshall. In deciding that there is little benefit in imposing an unavailability rule for out-of-court statements not made in the course of a prior judicial proceeding, the Court stated that "[m]any declarants will be subpoenaed by the prosecution or defense, regardless of any Confrontation Clause requirement, while the Compulsory Process Clause and evidentiary rules permitting a defendant to treat witnesses as hostile will aid defendants in obtaining a declarant's live testimony." *White*, 502 U.S. at 355; *see also United States v. Inadi*, 475 U.S. 387, 397-400 (1986) (holding that unavailability of co-conspirator need not be proved when "the defendant himself can call and cross-examine such declarants").

Some circuits, including the Tenth Circuit, have followed the Court's cue and held that there is no violation of the Confrontation Clause when the defendant neglected to exercise rights that would have enabled the him to confront the witnesses against him. *See, e.g.*, *United States v. Jackson*, 88 F.3d 845, 847 n.2

---

[10] "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI.

(10th Cir. 1996) (noting that the excited utterance admitted into evidence did not violate the defendant's Sixth Amendment right of confrontation in part because the defendant could have called the declarant as a witness and cross-examined him) (citing *Inadi*, 475 U.S. at 397-98 & n.8,); *Reardon v. Manson*, 806 F.2d 39, 42 (2d Cir. 1986) ("[I]t has become settled that, at least in those borderline cases where the likely utility of producing the witness is remote, the Sixth Amendment's guarantee of an opportunity for effective cross-examination is satisfied where the defendant himself had the opportunity to call the declarant as a witness."). *But see Simmons v. United States*, 440 F.2d 890, 891 (7th Cir. 1971) (holding that it is the government's burden to produce the declarant when the opportunity to cross-examine the declarant is essential to the defendant's right of confrontation).

Because the admission of the ATF certificate does not implicate the Sixth Amendment's limited requirement of availability, and because the defendant could have called Mr. Marshall as a witness, Rith's Sixth Amendment right of confrontation was not denied by the failure of the government to call Mr. Marshall as a witness.

**B. Reliability of the NFRTR Database**

The second basis of Rith's Sixth Amendment challenge is that his right to confront his accusers was violated because the ATF certificate, admitted under 803(10), does not embody the sufficient guarantees of reliability that the Confrontation Clause requires. Out-of-court testimony satisfies the requirements of the Sixth Amendment if it constitutes a "firmly rooted hearsay exception" or demonstrates particularized guarantees of trustworthiness. *See White*, 502 U.S. at 356-57 & n.8. Because this court concludes that the ATF certificate demonstrates particularized guarantees of trustworthiness, we need not address whether 803(10) constitutes a firmly rooted hearsay exception.

Rith contends that the NFRTR is not endowed with particularized guarantees of trustworthiness. Upon his objection to the admissibility of the ATF certificate, he submitted to the trial judge a set of discovery documents obtained from the government on March 22, 1996.[11] These documents include statements made by Tom Busey, then chief of the National Firearms Act Branch of the Bureau of Alcohol, Tobacco, and Firearms during an October 18, 1995 training session for Bureau of Alcohol, Tobacco, and Firearms ("ATF") inspectors and other investigative employees. Busey described the process by which ATF specialists search the NFRTR database for registration of Title II weapons. To

---

[11] Rith did not offer his exhibit into evidence.

support his claim of unreliability, Rith points to Busey's statements that sometimes information is missed "because there's only so many minutes in an hour and so many hours in a day," and because of error in inputting the serial numbers and conducting the search of the suspect's name or the registration number. Busey also stated that "when I came in a year ago, our error rate was between 49 and 50 percent."

In *Idaho v. Wright* the Supreme Court stated that "'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances." 497 U.S. 805, 819 (1990). Though "courts have considerable leeway in their consideration of appropriate factors," the relevant circumstances are those "that surround the making of the statement and that render the declarant particularly worthy of belief," such that "the test of cross-examination would be of marginal utility." *Id*. at 819-22.

The following factors are appropriate to test the trustworthiness of 803(10) evidence:[12] whether cross-examination of the declarant would be of marginal

_____

[12] The government urges us to employ the *Dutton v. Evans* "four-part analysis" to determine the reliability of the evidence. 400 U.S. 74, 88-89 (1970) (the statement contained no express assertion about past facts; the declarant was in a position to have personal knowledge of the matters in the statement; the possibility that the declarant's statement was founded on faulty recollection is extremely remote; and the circumstances surrounding the making of the statement were such that the possibility of misrepresentation was unlikely). *Dutton*'s factors are neither talismanic nor appropriate here. The Supreme Court itself has

(continued...)

utility, *id.* at 819-20; whether the testimony concerns the results of a mechanically objective test, the notes were taken contemporaneously with the performance of the test, and a supervisor reviewed the tester's methodology, *see Minner v. Kerby*, 30 F.3d 1311, 1314-15 (10th Cir. 1994); and whether the database from which the evidence comes is open to the public, increasing the probability that any errors will be found and corrected, *see United States v. Metzger*, 778 F.2d 1195, 1203 (6th Cir. 1985).

The record establishes that the NFRTR database has sufficient guarantees of trustworthiness to satisfy the Sixth Amendment. According to Mr. Busey's statements, a quality review team was instituted in 1994 and succeeded in reducing the critical-error rate to below three percent.[13] Additionally, the ATF

---

[12](...continued)
expressly declined to "endorse a mechanical test" for determining reliability. *See Idaho v. Wright,* 497 U.S. 805, 822 (1990). The *Dutton* factors are tailored to ascertain the reliability of a co-conspirator's statement, viewed by courts as inherently unreliable. *Cf. Wright* , 497 U.S. at 805 (identifying factors tailored to assessing reliability of statements made by child witness in child sexual abuse cases) . Here we have a public official who has a legally enforceable duty to make the out-of-court statement. *Cf. Warren v. United States*, 447 F.2d 259, 262 (9th Cir. 1971) (holding that presumption of trustworthiness in a ATF nonregistration certificate is warranted because "the declarant has a legally enforceable duty to maintain accurate records").

[13] In his remarks, Mr. Busey noted that the total error rate was lower than eight percent but that the critical-error rate was below three percent. A critical error, in contrast to a common error, is one in which a person's name is misspelled, presumably thwarting a diligent search for a registration under that person's name. A common error "is an error in the database entry, but it doesn't

(continued...)

-29-

discovery documents contain a copy of an audit performed by the Audit Services Division of the Department of the Treasury. The results of this February 7, 1996, audit shows that the critical-error rate of the database is no more than 1.5%. Furthermore, the accuracy of the registration check is buttressed by a second level review by a branch chief.

In addition to the reliability of the NFRTR, there is little to be gained from cross-examining Mr. Marshall. If the essence of cross-examination is that the declarant's memory, perception, bias, and narration will be tested, there is little likely benefit from cross-examination of an inspector who was hired for his skills and ability to perform the job of inspecting the NFRTR database and who does not personally know the defendant or any of his associates. *See Minner*, 30 F.3d at 1315 (discussing value of cross-examining police chemist in cocaine possession prosecution). Furthermore, Mr. Marshall undoubtedly conducts hundreds of registration searches in a year. It is unlikely that he would have any recollection of the Rith search and, consequently, he would be able to testify only as to his general search method. *See id.* (holding that unavailability need not be proved when chemist would likely not recall individual test and could testify only as to

---

[13](...continued)
affect a lookup."

standard laboratory procedure); *Reardon*, 806 F.2d at 41 (same). Cross-examination would be of marginal utility in this instance.

The cases that Rith cites to support his claim are inapposite because the defendants were able to argue that the evidence was deficient as it applied to them. In *United States v. Robinson* the files upon which the testimony was based were incomplete, resulting in a casual or partial search. 544 F.2d 110, 114-15 (2d Cir. 1976). In *United States v. Yakobov* the defendant's name was drastically misspelled on the ATF certificate, undermining any claim of "diligence" in the search. 712 F.2d 20, 24 (2d Cir. 1983). In both cases the courts' conclusions are unremarkable: evidence of a deficiency specific to the defendant in the search method or database may constitute sufficient evidence of unreliability. *See, e.g.*, *id.* (holding that "'if, *in a particular instance*, the circumstances indicate a lack of trustworthiness, the evidence should be excluded'") (quoting *Robinson*, 544 F.2d at 110) (emphasis added). Here Rith alleges no defect in the NFRTR database search as it pertained to him. General claims of unreliability, particularly those that rely upon outdated information, are not sufficient to raise a constitutional deficiency. *See also United States v. Regner*, 677 F.2d 754, 758-59 (9th Cir. 1982) (holding defendant's claim that "possible motives" by a foreign government to lie were not cognizable absent some evidence of actual bias toward the defendant).

Seven other circuits allow the admission of the absence of public record or entry testimony to prove the nonexistence of some matter in the face of Confrontation Clause claims. Six of these circuits have specifically allowed the admission of NFRTR certificates. *See United States v. Hale*, 978 F.2d 1016, 1020-21 (8th Cir. 1992) (NFRTR); *Metzger*, 778 F.2d at 1202 (NFRTR); *United States v. Herrera-Britto*, 739 F.2d 551, 552 (11th Cir. 1984) (foreign certificate of nonregistration); *United States v. Cruz*, 492 F.2d 217, 220 (2d Cir. 1973) (NFRTR); *United States v. Mix*, 446 F.2d 615, 1622-23 (5th Cir. 1971) (NFRTR); *Warren v. United States*, 447 F.2d 259, 262 (9th Cir. 1971) (NFRTR); *United States v. Thompson*, 420 F.2d 536, 544-45 (3d Cir. 1970) (NFRTR).

For the foregoing reasons, the admission of the ATF certificate into evidence did not constitute a violation of Rith's Sixth Amendment right of confrontation.

## V. Sufficiency of the Evidence

Rith argues the evidence was insufficient to support a conviction because the government failed to prove Rith's knowledge that the shotgun barrel was less than eighteen inches in length. A challenge to the sufficiency of the evidence is reviewed *de novo*, and this court evaluates "the sufficiency of the evidence by

'consider[ing] the collective inferences to be drawn from the evidence as a whole.'" *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997) (quoting *United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986)). Here there must have been some evidence from which the jury could find or reasonably infer that Rith knew (1) the length of the barrel of the shotgun was less than eighteen inches, or (2) the overall length of the shotgun was less than twenty-six inches. *See* 26 U.S.C. § 5845(a).

Rith testified that he did not know the length of his shotgun, though he handled it several times. But he also testified to knowing that the gun was a sawed-off shotgun, and that he knew the shotgun was much shorter than the rifle. Rebecca Bobich, the ATF agent who measured Rith's shotgun, testified that the length of the barrel was 13 and 3/4 inches, 4 and 1/4 inches shorter than the legal length. Additionally, Rith stated that he knew it was illegal to have a sawed-off shotgun.

From the evidence presented, the jury could have reasonably concluded that Rith knew the shotgun was under the legal length. Not only was Rith's shotgun observably shorter than the legal length, Rith testified to knowing that the shotgun was sawed off and that it was considerably shorter than the rifle. *See United States v. Mains*, 33 F.3d 1222, 1229 (10th Cir. 1994) (holding that intent requirement was met because defendant handled gun, knew it was sawed off, and

gun was visibly shorter than legal length); *United States v. Moore*, 97 F.3d 561, 564 (D.C. Cir. 1996) (holding that jury could have inferred that defendant knew rifle was under the legal length simply by observing the 13 1/16 inch weapon). Although Rith testified to not knowing the length of the shotgun, it is not our role to evaluate the credibility of witnesses and weigh conflicting evidence. *See United States v. Ramirez*, 63 F.3d 937, 945 (10th Cir. 1995). This court concludes that the evidence was sufficient to support the conviction.

## VI. Jury Instructions

Finally, Rith argues that his case should be remanded because the trial judge erred in instructing the jury that they are not "to be governed by sympathy, prejudice, or public opinion." Rith argues that this instruction "misled the jury into believing that they must convict, regardless of mercy or leniency."

The propriety of a jury instruction to which an objection was made at trial is reviewed *de novo*. The conviction will not be disturbed, however, absent a "'substantial doubt that the jury was fairly guided.'" *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994) (quoting *United States v. Mullins*, 4 F.3d 898, 900 (10th Cir.1993)).

The trial judge's admonition to the jury that it was not to be swayed by "sympathy, prejudice, or public opinion" did not mean that the jurors may not be swayed against the defendant only; it meant that they should not be swayed by sympathy, prejudice, or public opinion in favor of either party. The remainder of the instruction verifies its balance and propriety: "The defendant and the public expect you will carefully and impartially consider all of the evidence in this case, follow the law as I'm stating it to you, and reach a just verdict."

To the extent the defendant's appeal seeks to permit jury nullification, the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law. *See United States v. Grismore*, 546 F.2d 844, 849 (10th Cir. 1976). The jury's role is to apply the law to the facts of the case. The trial judge instructed the jury appropriately.

## VII. Conclusion

The judgment of the district court is accordingly **AFFIRMED** in all respects.