**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 14, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JEREMY ARRINGTON,

    Defendant-Appellant.

No. 08-4018

(D.C. No. 2:05-CR-0500-DB)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, EBEL,** and **HARTZ**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist the determination of

this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

Defendant Jeremy Arrington appeals the district court's denial of his

motion to suppress evidence. Following the denial of his motion, Arrington

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

entered a conditional guilty plea to possession of an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861(d). Arrington was sentenced to a term of imprisonment of one year and one day, thirty-six months of supervised release, a fine of $1000, and a special assessment of $100. Arrington remains on conditions of release pending this appeal.

Arrington appeals the district court's denial of his motion to suppress evidence obtained from a hotel room search. On appeal, the government agrees with Arrington and confesses error. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse and remand with directions to vacate both Arrington's conditional guilty plea, and his conviction.

I.

On May 2, 2005, Jeremy Arrington contacted his estranged wife Jennifer Arrington to discuss the possibility of reconciliation. Jeremy visited Jennifer at her place of employment at the Harmon Building in West Valley City, Utah. The couple left in Jeremy's car, with Jeremy's mother Pansy Arrington sitting in the back seat. They first stopped at a Jiffy Lube, where Jeremy and Jennifer got out of the car to have a cigarette. Jennifer told Jeremy that she had "cheated on him," Aplee. App. at 10, whereupon Jeremy stabbed himself in the forearm with a pocketknife. Next, they stopped at the Valley Fair Mall, where Pansy got out of the car to shop. While Pansy was shopping, Jeremy retrieved a gun from the trunk and asked Jennifer to shoot him. Jennifer refused. According to Jennifer,

-2-

"[Jeremy] didn't want to live if we weren't going to be together." Id. at 13.

Finally, they stopped at a La Quinta Inn so that Jeremy and Jennifer could check into a hotel room and continue their discussion. Neither Jeremy nor Jennifer had identification to rent a room as required by hotel policy. Pansy produced her identification, and the room was registered in Pansy's name. Jennifer paid sixty dollars cash for the room. Pansy left the hotel before the desk clerk handed the room key to Jeremy.

Jeremy wheeled three or four bags on a baggage cart to the room; Jennifer carried only her purse and cell phone. Jennifer did not intend to stay in the room long, because she had to return to work. While they were talking in the hotel room, Jennifer received a call from her father who said he would come to the hotel to get her. Jeremy held a gun to his head and threatened suicide if Jennifer left. After approximately twenty minutes in the room, Jennifer left the hotel with her father and contacted the police from a nearby parking lot.

Shortly after Jennifer and her father left, Jeremy went to the front desk and asked that Jennifer's name be removed from the guest registry. Jeremy then left the hotel and began walking back toward the Harmon Building. Officer Frank Venditti and other officers of the West Valley City Police Department intercepted Jeremy, placed him in handcuffs, patted him down for weapons, confiscated a pocket knife, and transported him to the hospital for treatment of the self-inflicted wound on his forearm.

Jennifer and her father met with Venditti at the hospital. Jennifer told Venditti what had occurred during the day. Venditti also spoke with an officer who had responded several days earlier to a trespass call made by Jennifer asking that Jeremy be removed from the property of one of her family members. Venditti decided to book Jeremy on charges of domestic violence stalking based on the events of the day and the trespass call.

At Venditti's request, Jennifer and her father met with him at the La Quinta Inn so that Venditti could retrieve any weapons from the hotel room. When Venditti approached the front desk with Jennifer to get a room key, the desk clerk refused to hand over a key to the room because Jennifer was not a registered occupant of the room. Jennifer told the desk clerk that she paid for the room, but the clerk still would not give Jennifer a key. The desk clerk told Venditti that Jeremy had requested that Jennifer's name be taken off the room. Venditti acknowledged that, at this point in time, he no longer believed Jennifer had access to the room.

Venditti called his sergeant and requested a warrant for the room. The sergeant told him they could not get a warrant for the room, but he suggested that Venditti explain the situation to the desk clerk. Venditti then told the desk clerk there were likely guns in the room and it was possible that Jeremy would return to the room in a "few hours" after being booked. Id. at 60. The desk clerk finally gave Venditti a key, but did not accompany him to the hotel room. Neither

Venditti nor Jennifer could recall which one of them opened the door to the hotel room. Venditti found two guns under the bottom drawer of the armoire, one of which was a sawed-off shotgun with a barrel length of less than eighteen inches.

II.

When reviewing a district court's denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the government. United States v. Kimoana, 383 F.3d 1215, 1220 (10th Cir. 2004). The ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewed de novo. Id. In the present case, the parties concede that there are no facts in dispute, and that the only issue presented by Arrington on appeal is whether the district court erred as a matter of law in concluding Jennifer Arrington had actual authority to consent to search of the hotel room where the sawed-off shotgun was found.

Hotel room guests possess a reasonable expectation of privacy protected by the Fourth Amendment prohibition against unreasonable searches and seizures. Id. at 1221 (citing Stoner v. California, 376 U.S. 483, 489-90 (1964)). In the absence of a search warrant, a lawful search of the premises may be conducted with voluntary consent from the individual whose property is searched or a third party with actual authority or apparent authority to consent to the search. United States v. Cos, 498 F.3d 1115, 1124 (10th Cir. 2007).

Arrington argues on appeal that Jennifer lacked actual authority to consent

to a search of the hotel room.[1]  Neither party appeals the district court's conclusions that Jennifer did not have apparent authority to consent to a search and that there were no exigent circumstances concerning public safety which would have justified the search.

A third party has actual authority to consent to a warrantless search if she has either "(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999).  The first test for assessing actual authority, mutual use by virtue of joint access, "is a fact-intensive inquiry."  Id. at 1329-30.  The second test, control for most purposes, "is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Id. at 1330.  A husband-wife relationship triggers the presumption of control for most purposes, but it may be rebutted by facts showing a prior understanding that one spouse, in this case Jennifer, must have the permission of the other spouse, in this case Jeremy, to enter the property.  See id. at 1331.

The district court found that Jennifer had actual authority to consent to a search of the hotel room.  The court reasoned that

---

[1] Although neither party argues that the desk clerk had authority to consent to the search of the motel room, that argument would be foreclosed by Stoner v. California, 376 U.S. at 488.

-6-

the Arringtons stand in virtually the same position as joint occupants of the room. The room was rented for a mutual and limited purpose. Check-in was accomplished mutually. The single key, while in the actual physical possession of Defendant, was distributed in their joint presence for the purpose of allowing them mutual access to the room. Both took personal belongings into the room. They entered together and remained in the room together until Jennifer left to meet her father. Shortly thereafter Defendant also left—although he did leave bags and firearms in the room. The fact that Defendant maintained the single key issued to the couple is not persuasive.

Aplt. App. at 22-23 (Doc. 30 at 8-9). Additionally, the court discounted Jeremy's request that the desk clerk remove Jennifer's name from the guest registry because Jeremy had no authority to request that names be added to or deleted from the guest registry. Pansy, the only registered occupant of the room, was the only person with authority to add or delete names on the registry. Aplt. App. at 23 (Doc. 30 at 9 n.14).

Applying the Rith standards, we disagree with the district court's conclusion that Jennifer had actual authority to consent to a search of the hotel room. First, Jennifer did not have mutual use of the property by virtue of joint access. Jennifer spent a total of twenty minutes in the room with Jeremy. Jennifer did not have a key, did not leave any personal belongings in the room, and did not plan to spend the night there. The desk clerk refused to let her enter the room until Venditti intervened. Jennifer did not have access to the hotel room, joint or otherwise.

-7-

Second, Jennifer did not have control for most purposes over the property. While a husband-wife relationship does raise the presumption of control for most purposes, that presumption is rebutted by the facts in this case. Jeremy and Jennifer were estranged. Jeremy stabbed himself and threatened suicide after Jennifer admitted that she was unfaithful. Jeremy requested that Jennifer's name be removed from the room's guest registry. Although still legally married, the couple did not have the close relationship that would allow a presumption that Jennifer controlled the room and its contents. Under either Rith standard, Jennifer Arrington did not have actual authority to consent to a search of the hotel room.

We REVERSE the district court's judgment and REMAND with directions to vacate both Arrington's conditional guilty plea, and his conviction.

Entered for the Court

Mary Beck Briscoe
Circuit Judge