UNITED STATES of America,
Plaintiff,

v.

Timothy G. TUCKER, a/k/a, Kenneth G. Carter, a/k/a, Scott L. Kelley, Defendant.

No. 99–20041–G.

United States District Court, W.D. Tennessee, Western Division.

July 2, 1999.

---

Carroll L. Andre, III, Asst U.S. Attorney, Memphis, TN, for plaintiff.

Thomas J. Gibson, Asst. Federal Defender, Memphis, TN, for defendant.

## ORDER DENYING MOTION TO SUPPRESS

GIBBONS, District Judge.

Before the court is defendant Timothy G. Tucker's motion to suppress. The motion was referred to the United States Magistrate Judge for report and recommendation. The magistrate judge's report was filed May 7, 1999. Defendant has filed objections to the report and the government responded to those objections.

The court has reviewed the magistrate judge's report and recommendation, defendant's objections, the government's response and the transcript of the hearing before the magistrate judge. Based on a *de novo* review of the record before the magistrate judge, the court adopts the magistrate judge's report. The motion to suppress is denied.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

VESCOVO, United States Magistrate Judge.

Defendant, Timothy Tucker, has been indicted on two counts of possessing a machine gun, two counts of possessing an unregistered destructive device, and two counts of possessing a firearm with an obliterated or removed serial number in violation of 18 U.S.C. § 922(*o*) and 26 U.S.C. §§ 5841 and 5861. On March 8, 1999, defendant filed a motion to suppress all evidence including statements resulting from the February 1, 1999 search of an apartment located at 2499 Jonquil in Memphis. This motion is presently before the court upon referral by United States District Court Judge Julia Smith Gibbons for an evidentiary hearing and report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

An evidentiary hearing was held on April 15, 1999. After calling Nancy Robson, resident manager of The Birches at Countryside apartment complex, Special Agent C.M. Sturgis, and Special Agent Michael J. Donnelly as witnesses, the United States rested its case-in-chief. The defendant's only witness was Lori French, defendant's girlfriend and lessee of 2499 Jonquil. For the limited purpose of providing rebuttal evidence, the government recalled Agent Donnelly.

Because the court finds that the defendant's rights under the Fourth and Fifth Amendments were not violated by the actions of federal agents on February 1, 1999, the court recommends that defendant's motion to suppress be DENIED.

### PROPOSED FINDINGS OF FACT

On February 1, 1999, members of the Memphis Safe Streets Task Force, led by Special Agent Sturgis of the FBI, went to 2499 Jonquil in order to arrest defendant on an unlawful flight to avoid prosecution warrant in connection with an outstanding Arkansas misdemeanor charge. The agents knew that Lori French resided at 2499 Jonquil, but also possessed information that defendant had been residing there as well. The defendant and French met in Arkansas in 1994 when defendant was an attorney in Wynn, Arkansas. Agent Sturgis suspected defendant was present inside the residence because a white BMW registered under the name Kenneth Carter, a known alias of the defendant, was parked outside. At about

2:30 p.m., task force members, wearing clothing identifying themselves as law enforcement officers, approached the residence, knocked on the door, and announced their presence. The officers also telephoned inside the apartment and announced their presence over the answering machine. Despite their continued efforts, no one came to the door.

While the officers were waiting for a response from inside, Agent Sturgis observed French's gold Nissan Maxima approaching.[1] Agent Sturgis, wearing an FBI raid jacket, walked toward the approaching vehicle and waved his arms to attract French's attention. French's vehicle continued past the apartment. During the hearing, French testified that she did not notice anyone trying to wave her down but did see some men gathered in the parking lot in front of her house. She insisted that she was going to check her mail. Agent Sturgis sent another member of the task force, Shelby County Sheriff's Deputy J.C. Parris, to stop French and ask her to return to the apartment. French stopped near the area containing the residents' mailboxes and agreed to return to her apartment.

Agent Sturgis informed French as to defendant's fugitive status, showed her the warrant for his arrest, and explained that it was a crime to harbor a fugitive and that she could be charged if she did anything to impede their efforts to arrest the defendant. Agent Sturgis also informed French, a registered nurse, that if she were convicted of such a crime she would probably lose her nursing license. He emphasized that he wanted to effect the arrest as safely as possible and did not want to cause property damage. French acknowledged that the defendant lived in the apartment, but that the apartment lease was in her name only. She agreed to cooperate, assured the officers that no weapons were present in the apartment,

and handed her keys to Agent Sturgis. French testified, however, that during this time Sturgis was in her face yelling and threatening her with arrest for harboring a fugitive.

Agent Sturgis used French's key to unlock the deadbolt, but as he unlocked the door knob defendant relocked the deadbolt from inside. Agent Sturgis persisted with his attempts to unlock the door, but the lock/unlock game continued. Through the door, French pleaded with the defendant to come out. When it became apparent that force might be necessary to gain entry, French was escorted from the doorway by an officer, patted down, and seated in a squad car for her own safety. Apparently having overheard plans to break the door down, defendant voluntarily exited the apartment. Defendant was immediately placed under arrest, handcuffed, and taken to the squad car. He was not read his *Miranda* rights at the time of his arrest, but no questioning of the defendant transpired at the scene. French was released from the squad car and ushered back to her apartment. Agent Sturgis returned French's apartment keys and explained that agents might have to return to conduct a more extensive interview with her. Agent Sturgis asked if she would be available later for questioning. French said she would be at the apartment if they needed her. At approximately 3:30 p.m., defendant was transported to the Criminal Justice Center located at 201 Poplar.

French's recollection of the events differed. She testified that Agent Sturgis told her firmly that they would be coming back and that she "better be there," and therefore she did not feel free to leave her apartment. French also testified that she feared being arrested for harboring a fugitive and felt she had no choice but to comply with Agent Sturgis's orders. Nevertheless, she stated that irrespective of Agent Sturgis's demand that she gather

---

1. Agent Sturgis had familiarized himself with pictures of French and knew the make and model of car she owned.

defendant's things and have them ready when the officers returned, she did not make any effort to comply with these instructions. Despite having lived with an attorney for over four years, French did not call an attorney, or anyone else, after the agents left her apartment complex that afternoon.

After arriving at the CJC, defendant was read his rights, executed a *Miranda* waiver, and agreed to be interviewed by law enforcement agents. During the interview, defendant acknowledged he used various aliases including Kenneth Carter, Scott Kisrow, and Scott Kelly. These names alerted the agents because of their significance to another FBI investigation into a fraudulent check cashing scheme. When questioned regarding firearms, defendant, who had previously been licensed as a federal firearms dealer, asserted that there were no firearms present at 2499 Jonquil. Defendant explained that he and French were in a relationship and lived together. He admitted that the apartment lease was in French's name and that the telephone and utilities were listed under Kenneth Carter.

Agent Sturgis then contacted Special Agent Donnelly who had been investigating the fraudulent transactions as a member of the FBI's white collar crime division. Agent Sturgis suggested that interviewing French might be beneficial and offered to accompany Agent Donnelly to the interview. Around 7:00 p.m., Agent Donnelly telephoned French and asked whether she would be available for an interview concerning the defendant. French testified that during this conversation Agent Donnelly told her that defendant had said it would be okay for her to cooperate. Agent Donnelly denies making any such statement.

Agents Sturgis and Donnelly along with Deputy Parris arrived at French's apartment between 8:30 and 9:00 p.m. and proceeded to interview French in her living room for about an hour to an hour and fifteen minutes. At several points during the interview, French became emotional and began crying. French described herself as upset, nervous, and scared during the interview. After reviewing various drivers licenses, French confirmed that Carter, Kisrow, and defendant were all the same person.

The agents were acutely interested in interviewing French because she had endorsed and deposited into her checking account a $26,365.00 check made out to Scott Kisrow, (*see* Exh. 11.), and then wrote checks made out to cash for $17,-000.00 and $6,000.00. As to the Kisrow check, French denied any wrongdoing on her part. French asserted that she never noticed the name on the check and that defendant had asked her to leave room on the back of the check for him to endorse it above her name. French informed the agents that defendant had used some of the proceeds of the transactions to purchase his BMW. The agents informed French that they would be taking the BMW. When the interview concluded, the agents asked French if she would consent to a search of her residence primarily for papers and other identification materials linking defendant to the financial transactions along with any obvious contraband.

French was presented with a standard consent to search form which set out in numbered paragraphs that she had the right to refuse consent, that her consent was voluntary, and that the agents could take any items determined to be related to their investigation. (*See* Exh. 3.) French signed and dated the document and additionally placed her initials beside each of the enumerated provisions. According to Agent Donnelly, French was informed that she could stop the agents at any time and that she was free to accompany them during the search. At the hearing, French denied being told that she could stop the search at any time. She testified that she felt she had no real choice other than to sign the form.

The apartment at 2499 Jonquil is a relatively small one-bedroom unit, approximately 500 square feet, with one bathroom, a living room, and an eat-in kitchen. After French signed the consent to search form, the agents, accompanied by French, began searching the residence. Agent Donnelly first searched a sideboard/hutch abutting the wall in the living room, where he found some "Kelly" and "Carter" documents. At this time, or perhaps earlier, Agent Donnelly seized the keys to defendant's BMW. According to Donnelly, he left the other keys on the sideboard. French testified that Donnelly took all the keys including a suitcase key.

Agent Sturgis first went to the bedroom walk-in closet. On the floor of the closet, Sturgis found a paper bag containing numerous items, including Federal Express employment materials, bearing the name Kenneth Carter. In that closet, Sturgis also found a bandolier of ammunition and four unloaded long guns. According to Agent Sturgis, French indicated that one of the guns might be hers but that the other three belonged to defendant. The guns were removed from the closet, and their serial numbers run against FBI records. The records check revealed that the guns had not been stolen, and Sturgis returned them to the closet.

Agent Sturgis then checked the mattress and box spring which rested directly on the bedroom floor, not on a frame. Under the lower right hand corner of the mattress, Sturgis found a wallet containing identification bearing one of defendant's aliases. Under the head of the mattress, Agent Sturgis found two loaded pistols—a .22 magnum and a .30 caliber—which appeared to be legal. Agent Sturgis, with help from Agent Donnelly and Deputy Parris, then lifted up the box spring. Under the box spring, the agents discovered a loaded AR–15 automatic rifle [2] fitted with a scope and a laser sight. A portion of the serial number on the weapon had been obliterated. Agent Sturgis field-tested the

weapon and discovered that it was capable of functioning in a fully automatic fashion. French denied knowing that these items were under the mattress and box spring.

Next the agents searched a utility-type closet in the entry hall. Inside the closet, the agents found hanging clothes, a tool box, some roller blades, and a large, brown, hard-shell suitcase. Agent Donnelly carried the heavy suitcase out of the closet and laid it on the bedroom floor. Both Agent Donnelly and Agent Sturgis testified that they could see that one of the latches on the suitcase was broken and that the suitcase popped right open as it was laid on the floor. Inside the suitcase, the agents found various silencers, pistols, and shoulder assemblies, including a MAC–11 sub-machine pistol without a serial number. Some of the items in the suitcase were wrapped in clothing. At the hearing, French denied any prior knowledge as to the contents of the suitcase, denied having permission to open the suitcase, stated that the suitcase was usually locked, and claimed to have witnessed Agent Donnelly open the suitcase with a key.

In the bottom of the closet next to the suitcase, the agents found two green ammunition boxes. The outside of the boxes bore the following yellow markings: "1000 CRTGS CAL 9MM S. (SUBSONIC) N00164–88–C–0265 FC–89E001–003." (*See* Exh. 4.) The boxes were not locked, but the tops were closed and latched. The agents removed the ammunition boxes from the closet, unlatched the first box, and peered inside. Immediately, they were able to see detonation cord and some black foam surrounding a hand grenade which appeared to have its pin still inserted. The agents carefully proceeded to unlatch the second ammunition box and found that it contained what appeared to be a pipe bomb along with more detonation cord. Uncertain of the stability of these devices and fearful for their own safety as

---

**2.** The AR–15 is the commercial equivalent of an M–16.

well as the safety of the residents of the apartment complex, the agents seized these devices and removed them from the premises.[3]

Throughout the search, French accompanied the agents and pointed out which items were hers and which items were defendant's. When French made it clear that an area being searched contained only her items, the agents ceased searching in those areas. During the search of the hall closet, French stated that the suitcase and the ammo boxes belonged to the defendant. French stated that she had not seen any ammo boxes since she and the defendant had moved to Tennessee. At the hearing, French testified that she did not have permission to open defendant's suitcase. At no time during the search, however, did French assert that she lacked authority to consent to a search of the items she stated were defendant's, nor did she ever admonish the agents for searching defendant's possessions. Rather, it is clear that French's purpose in delineating what items were hers was to facilitate the agents' search of defendant's possessions.

There were many areas in which the testimony of French and Agents Sturgis and Donnelly directly conflict. As a result, the court cannot credit the testimony of French without discrediting the testimony of the FBI Agents and vice versa. To the extent that the testimony of French contradicts the testimony of Agents Sturgis and Donnelly, the court finds her testimony not credible and credits the testimony of the law enforcement agents. This court had the opportunity to observe each witness's demeanor firsthand. Agents Sturgis and Donnelly did not provide the court with any reason to doubt their testimony.

On the other hand, there are various factors which render French's credibility suspect. First, French remains the defendant's girlfriend, and it is clear that despite all that has happened, she does not

want her boyfriend in jail. Also, French's actions are inconsistent. French insisted to agents that there were no firearms in the apartment yet admitted to ownership of at least one of the long guns found in the bedroom closet. French maintains she was not permitted access to defendant's suitcase, but asserts that she knows that it was usually kept locked. French insists she feared arrest if she did not do exactly what the agents asked, but admits that she did not gather defendant's things as she claims she was told to do.

Additionally, the court finds several areas of French's testimony simply unworthy of belief. French's explanation of how she managed to endorse and deposit a check made out to Scott Kisrow without noticing or questioning the unfamiliar name on the check rings hollow. Also, the court finds it peculiar that French did not consider it suspicious when defendant told her he legally changed his name to Kenneth Carter upon the couple's arrival in Tennessee. Further, it is highly improbable that French never noticed two rather large ammunition boxes adorned with bright yellow lettering in a relatively small, hall closet where hanging clothes, tools, roller blades, and a vacuum cleaner were kept. (*See* Exh. 7—admitted to show dimensions only.) Lastly, the court is thoroughly unconvinced by French's assertion that she had no knowledge that pistols were hidden under the mattress. Assuming the handguns had not just recently been placed there, it would be nearly impossible for French to have changed the bed sheets even once without discovering firearms. All in all, the court finds French's testimony to be unworthy of belief.

## PROPOSED CONCLUSIONS OF LAW

### I. SUPPRESSION OF STATEMENTS

█ In his motion to suppress, defendant seeks suppression of "any and all evidence, including statements arising out

---

**3.** Later, during inventory, the presence of explosive devices in these ammo boxes was confirmed, and the devices were detonated in a safe location by members of the bomb squad.

of and resulting from" the search of 2499 Jonquil. However, defendant's motion lacks any discussion regarding statements. Likewise, defense counsel made no arguments during the suppression hearing regarding why defendant's statements should be suppressed or even what particular statements were being challenged.[4] Nevertheless, because suppression of statements has been requested as relief, the court will address the issue.

■ The Fifth Amendment prohibits an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In safeguarding this Fifth Amendment protection, the United States Supreme Court designated prophylactic measures which must be taken prior to police questioning of a subject in custody lest any responsive statements be presumed to violate the Fifth Amendment. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Miranda*, the Supreme Court pronounced that a suspect must be advised that she has certain rights prior to any custodial interrogation taking place. Here, it is clear that *Miranda's* requirements were complied with. Although defendant was taken into custody at the time he emerged from 2499 Jonquil, he was not subject to custodial interrogation until he was interviewed at the CJC. Before the interview began, the defendant was properly advised of his rights and thereafter waived them. (*See* Exh. 2.)

■ Regardless of *Miranda* warnings, a confession must be voluntary to be valid and a coerced confession must be excluded. *See Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that an involuntary confession violates due process). The prosecution bears the burden of proving by a preponderance of the evidence that the confession was voluntary. *See id.* at

168, 107 S.Ct. 515. The general test for voluntariness is whether the accused's will was overborne or was the product of rational intellect and free will. *See Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

In *Connelly*, the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Connelly*, 479 U.S. at 167, 107 S.Ct. 515. Defendant has not even alleged much less proven that he was threatened or in any way coerced into agreeing to speak with law enforcement. Defendant, a former attorney, certainly would have been aware of his right to remain silent. Accordingly, to the extent defendant's motion seeks suppression of statements, it is denied.

## II. *SUPPRESSION OF PHYSICAL EVIDENCE*

Defendant seeks to suppress all physical evidence recovered as a result of the warrantless search of 2499 Jonquil. In opposition to the defendant's motion, the government insists that Lori French, the resident lessee and an individual with common authority over the premises, consented in writing to the search of 2499 Jonquil thereby obviating the need for a search warrant and rendering the search reasonable for purposes of the Fourth Amendment. Defendant does not dispute French's authority to consent to a search of her residence, but argues that French's consent was not voluntary and, even if voluntary, her authority did not extend to the closed containers located in the hall closet which belonged exclusively to the defendant.

■ Prior to discussing the substantive issues regarding French's consent, the court must address an argument the government advanced for the first time in

---

4. Because of the personal nature of the Fifth Amendment right against self-incrimination, the court has assumed defendant is not seeking to suppress statements made by French which would incriminate defendant. *See Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973).

closing argument during the suppression hearing: the defendant's "standing" to challenge the voluntariness of French's consent. Essentially, the government argues that because Fourth Amendment rights cannot be asserted vicariously, defendant's challenge to French's consent must be limited to the grounds that she lacked authority to consent.

The Supreme Court expressly rejected the "rubric of standing" as to violations of the Fourth Amendment over twenty years ago. *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998) (citing *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Instead, the proper inquiry is whether the defendant personally has an expectation of privacy in the place searched. *See id.* at 143-44, 99 S.Ct. 421. The government has not disputed defendant's privacy expectations in the apartment. Indeed, by its position that defendant can challenge French's authority to consent, the government has implicitly recognized that defendant has a legitimate expectation of privacy in the residence at 2499 Jonquil even though his name may not have appeared on the lease.

■■■ The Fourth Amendment prohibits the warrantless entry of an individual's home. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). "The prohibition does not apply, however, to situations where voluntary consent has been obtained, either from the individual whose property is searched, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), or from a third party who possesses common authority over the premises." *Id.* "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." *United States v. Jenkins,* 92 F.3d 430, 436 (6th Cir.1996). Consent to search only vitiates the warrant requirement if the consent was voluntarily given. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). When the validity of a warrantless search

is based on consent, the government has the "burden of proving that the necessary consent ... was freely and voluntarily given." *Royer,* 460 U.S. at 497, 103 S.Ct. 1319. Accordingly, a necessary element of the government's case is to show that consent, no matter from whom received, was voluntary. Therefore, it is not the defendant who raises the issue of voluntariness in the first instance, and it would be wholly inappropriate to prevent the defendant from contesting the government's assertion that the consent was voluntary. *Cf. United States v. Mayes,* 552 F.2d 729, 733 (considering defendant's challenge to voluntariness of consent and finding consent to search apartment provided by defendant's girlfriend was not voluntarily given).

*United States v. Riascos–Suarez,* 73 F.3d 616 (6th Cir.1996), relied upon by the government, is inapposite. Riascos–Suarez did not have standing to challenge his girlfriend's consent to search her hotel room because he had checked out earlier; he no longer enjoyed a "legitimate expectation of privacy." *Id.* at 625 n. 3. Whereas here, it is uncontested that defendant, as a resident, had a legitimate privacy expectation in the apartment and, therefore, has "standing" to contest the voluntariness of French's consent.

### A. *Voluntariness of French's Consent*

■■■ The Supreme Court has articulated a list of factors which must be evaluated in determining whether consent was provided freely and voluntarily. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In *Schneckloth,* the Court found that no single factor was determinative of voluntariness, rather voluntariness is to be determined from the totality of the surrounding circumstances. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041. Relevant factors include the age, education, and intelligence of the one giving consent, evidence of duress or coercive activity, and the presence or absence of warnings concerning constitutional rights. *See id.*

The Sixth Circuit recently set forth its analysis for determining the validity of a consent to search in *United States v. Riascos–Suarez*, 73 F.3d 616 (6th Cir. 1996), as follows:

> A court will determine whether consent is free and voluntary by examining the totality of the circumstances. It is the Government's burden, by a preponderance of the evidence to show through "clear and positive" testimony that valid consent was obtained. Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*Riascos–Suarez*, 73 F.3d at 625 (citations omitted). Knowledge of the right to refuse consent is "one factor" to consider, but the "government need not establish such knowledge as the *sine qua non* of effective consent." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041.

Upon examination of the relevant factors, this court finds that French freely and voluntarily consented to the search of 2499 Jonquil. French, a licensed R.N. in her mid-twenties, signed a consent to search form which specifically stated that she had the right to refuse consent. (*See* Exh. 3.) French separately initialed both the provision setting forth her right to refuse consent and the provision stating that consent was being given voluntarily. French was seated on a couch in her own apartment at the time she provided consent. French was never threatened, punished, or in any way coerced to consent to a search of her apartment. Over four hours had elapsed since defendant was arrested and since French already had been told she could be "taken downtown" for harboring a fugitive. In fact, French accompanied the officers around her apartment during their search and helpfully pointed out to them which items in the apartment belonged to whom. The court has already specifically found French to lack credibility. For similar reasons, the court finds French's testimony that she felt she had no choice but to provide consent to search not to be credible.

Because the court finds French's consent to search was voluntary, the only items, if any, for which suppression would be proper would be those items uncovered from areas over which French did not have authority to consent to a search.

B. *French's Authority to Consent to a Search*

Consent to search can be provided by "a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Moore*, 917 F.2d 215, 223 (6th Cir.1990). Common authority is

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988.

At the time of the search, French was the lessee of the apartment at 2499 Jonquil and resided there. As an inhabitant of 2499 Jonquil, she had the right to permit entry by individuals of her choosing. Thus, French clearly had the requisite authority to consent to a search of her apartment, including specifically the bedroom and the bedroom closet, both joint areas. Accordingly, there is no legitimate basis for suppressing the identification materials discovered in a paper bag on the floor of the walk-in bedroom closet, the

wallet and loaded pistols discovered under the mattress, and the AR–15 assault rifle discovered under the box spring in the bedroom. *See United States v. Ladell,* 127 F.3d 622, 624 (7th Cir.1997) (upholding search under mattress where defendant's mother gave consent to search); *Moore,* 917 F.2d at 223 (upholding search under chest of drawers where defendant's live-in girlfriend gave consent to search).

■■■ The critical issue is whether French had authority to consent to search the closed containers—the suitcase and ammo boxes—found in the hall closet. Without question, French had the actual authority to consent to a search of the hall closet as it was clearly an area which she mutually used and over which she had "joint access or control for most purposes." *Matlock,* 415 U.S. at 171 n. 7, 94 S.Ct. 988. Authority to consent to search of an area, however, is not necessarily co-extensive with authority to consent to the search of a closed container stored in that area. *See United States v. Karo,* 468 U.S. 705, 725–26, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (O'Connor, J., concurring) (concluding that when a private container, to which the homeowner has no right of access, enters the home "the homeowner also lacks the power to give effective consent to the search of the closed container"); *United States v. Salinas–Cano,* 959 F.2d 861, 865 (10th Cir.1992) (finding that "ownership and control of property does not automatically confer authority over containers within it"); *United States v. Rodriguez,* 888 F.2d 519, 523 (7th Cir.1989) ("To say that Mrs. Rodriguez consented to a search of the janitors' room is not necessarily to say that she consented to a search of the items it contained.") The burden of establishing common authority over a container is on the government. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

■■ A person has an expectation of privacy in his or her private, closed containers, which is "not forfeited merely because the container is located in a place

that is not controlled exclusively by the container's owner." *See United States v. Fultz,* 146 F.3d 1102, 1105 (9th Cir.1998) (holding defendant had reasonable expectation of privacy in cardboard boxes in garage of friend's residence where he stayed temporarily and girlfriend lacked authority to consent to a search of the boxes). French clearly identified all three of the closed containers at issue here as the exclusive property of the defendant and disclaimed any ownership interest in them. Indeed, she testified that she had not seen any ammo boxes since she and the defendant had moved to Memphis.

■■■ A closed and/or locked suitcase epitomizes the kind of closed container entitled to heightened privacy protection. *Id.; United States v. Salinas–Cano,* 959 F.2d 861, 865 (10th Cir.1992) (finding consent of defendant's girlfriend to search defendant's closed suitcase located in her apartment was insufficient to authorize search.) The court need not determine the issue of authority to consent as it relates to the suitcase in this case, however, because the agents did not open the suitcase. Both Agent Sturgis and Agent Donnelly testified that when Agent Donnelly removed the suitcase from the hall closet and placed it on the bedroom floor the suitcase popped open. Agent Sturgis testified that when Donnelly was carrying the suitcase one of the latches appeared to be broken. Agent Donnelly also testified that he noticed the broken latch. There was no testimony that excessive force was used in placing the suitcase on the ground. Although French testified that she saw Agent Donnelly use a key to open the suitcase, the court has already found French's testimony was not credible. The agents did not act improperly or outside of the scope of consent in moving the suitcase from the closet to the bedroom. Unquestionably, the agents could have legally moved the suitcase from the premises and maintained possession of it while seeking a search warrant. Once the suitcase popped open of its own accord, whether it hap-

pened as a result of the weight of its contents or a faulty latch, the items inside the suitcase were at that point in plain view of agents lawfully on the premises; thus, the plain view exception to the Fourth Amendment provides the justification for the seizure of the weapons contained therein.[5] *See Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

The two ammunition boxes present a more difficult question. Both boxes were closed and latched, but not locked. As a general rule, law enforcement officers have no authority to open a closed container absent a valid warrant, consent, or exigent circumstances which support the need for an immediate search. *United States v. Chadwick,* 433 U.S. 1, 11–16, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (holding that warrantless search of double-locked footlocker in trunk of car was un-

constitutional and declining to extend "automobile exception" to containers in cars), *overruled by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Unless French had actual or apparent authority to consent to a search of the ammo boxes or exigent circumstances existed, the search of the ammo boxes would violate the defendant's expectation of privacy in his closed, private containers.

The defendant relies primarily on *United States v. Salinas–Cano,* 959 F.2d 861 (10th Cir.1992). In *Salinas–Cano,* the Tenth Circuit stated that "[t]he government must come forward with persuasive evidence of both shared use and joint access or control of a container in order to support third party consent." *Id.* at 864, citing *United States v. Matlock,* 415 U.S. 164, n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).[6] The Tenth Circuit articulated four factors to consider in determining

---

**5.** To the extent the weapons were wrapped in trousers, the end result does not change because of the related "plain feel" exception. *See Minnesota v. Dickerson,* 508 U.S. 366, 371, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The agents, upon seeing suspicious looking items wrapped in pants, could touch the bundled items and plainly feel from the size and shape that they contained weapons. *See, e.g., United States v. Robinson,* 999 F.Supp. 155, 161 (D.Mass.1998) (finding that automatic weapon wrapped in towel would be identifiable by a plain feel search).

**6.** There is a split among the circuits whether under the *Matlock* definition of common authority "joint use" is required or whether "joint access" standing alone is sufficient. In *United States v. Whitfield,* 939 F.2d 1071, 1074 (D.C.Cir.1991), the D.C. Circuit, finding the search of an adult child's bedroom to be improper based only on the mother's consent, required proof of both mutual use and joint access in order for a parent to have authority to consent to a search of an adult child's bedroom. Compare *United States v. Rith,* 164 F.3d 1323, 1327–29 (10th Cir.1999), wherein the Tenth Circuit recently clarified its interpretation of *Matlock's* definition of common authority to mean: "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* The Tenth

Circuit went on to explain that the first option, mutual use by joint access, is a "fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject." *Id.* Control depends on the relationship of the parties. Certain relationships, such as family relationships, create a presumption of control which may be rebutted by facts such as locks on the door or an explicit agreement that the third party may not enter. The Tenth Circuit construed the language in *Salinas–Cano* stating that *Matlock* requires "both shared use and joint access or control of a container in order to support third party consent" to be consistent with its own disjunctive definition. *Id.* at 1329 n. 2.

The Sixth Circuit has not specifically addressed the question but it appears that the Sixth Circuit would require some type of shared use. *See United States v. Johnson,* 22 F.3d 674, 678 (6th Cir.1994) (finding kidnap victim did not have common authority over closet where guns were found because of lack of evidence that victim had personal possessions in closet) and *United States v. Clutter,* 914 F.2d 775, 777–78 (6th Cir.1990) (upholding consent of children to a search of their father's bedroom because family members have the "run of the house" but voicing a reluctance to approve third-party consent searches of an enclosed space in the house in which a family member has manifested an expectation of exclusivity).

whether a third-party had authority to consent to a search of a closed container: "(1) whether the container is one that historically has commanded a high degree of privacy (such as suitcases and footlockers); (2) precautions taken by the owner to manifest his subjective expectation of privacy; (3) whether the search was undertaken at the behest of a third party concerned for the safety of the household; and (4) whether the third party has made his or her lack of interest in the item known to the official conducting the search." *United States v. Robinson,* 999 F.Supp. 155, 161 (D.Mass.1998) (citing *Salinas–Cano,* 959 F.2d at 864–65).

Unlike containers such as suitcases, purses, briefcases and footlockers, in which people normally store personal belongings, an ammunition box, clearly marked as such, is not the type of container in which one would generally have a high expectation of privacy. Defendant did not manifest any expectation of privacy in the ammo boxes by taking precautions to safeguard the contents. He did not lock the boxes although it would have been possible to do so, choosing instead to leave them accessible merely by undoing a latch. Also, by using a box with markings presumably indicating its contents, the defendant demonstrated a lack of expectation of privacy. Further, defendant presented no evidence that he took steps to restrict French's access to the boxes. Nor was there any evidence that French communicated her lack of authority to the officers other than disclaiming ownership. Conversely, no evidence was presented that French had ever used or had been permitted to use the ammo boxes to store her personal belongings. *Compare Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (upholding consent

search of duffle bag where the person giving consent jointly used the duffel bag to store clothing). The only evidence presented that French had joint access to, or control of, the ammo boxes was the fact they were located in the hall closet of her apartment, unlocked, and commingled with her belongings.[7]

Nevertheless, by storing the unlocked ammo boxes in a common area of the apartment, defendant indicated a lowered expectation of privacy in the containers and assumed the risk that French might permit a search of them. As previously stated, the hall closet in which these items were located contained items belonging to both French and the defendant, and defendant had no reason to believe that French would not notice these clearly marked ammunition boxes, become suspicious, and allow others access. *Cf. United States v. Hiles,* Nos. 89–2238, 89–2383, 1990 WL 106174, at *4 (6th Cir. July 27, 1990) (unpublished opinion) (holding defendant lacked standing to contest consent but finding nevertheless that defendant had no legitimate expectation of privacy when suitcases were placed in a clothes closet of the lessee of the premises and stating that the owner of the suitcases "took the risk that she could have become suspicious [and] called her entire neighborhood to look through the contents"). *See also United States v. Davis,* 967 F.2d 84, 88 (2nd Cir.1992) (applying the "assumption of the risk" approach from *United States v. Matlock* and finding consent of owner of footlocker extended to closed containers of defendant located in the footlocker). The court submits therefore that French had the actual authority to consent to a search of the ammo boxes based on her joint access and control and defendant's assumption of the risk.[8]

7. Although it should not be overlooked that defendant and French's relationship was much closer to a husband-wife relationship of the sort giving rise to a presumption of control over property than a mere co-tenant relationship. *See Rith,* 164 F.3d at 1330.

8. If it were readily apparent from the boxes' external markings that the contents were ammunition for either of the illegal weapons uncovered on the premises or illegal in and of itself, then the agents would have had an additional basis for conducting a warrantless search of the two ammunition boxes based on

Finally, irrespective of French's authority to consent, the agents properly searched the second ammo box under the exigent circumstances exception to the warrant requirement. *See United States v. Johnson*, 22 F.3d 674 (6th Cir.1994) (recognizing four exigent circumstances which justify a warrantless search, one of which is the risk of danger to police or others). After discovering a hand grenade and detonation cord in the first ammo box, the officers could presume that a bomb or other explosive device might be stored in the second box. As the Supreme Court recognized in *United States v. Chadwick*, "[i]f officers have reason to believe luggage contains an immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon." *Chadwick*, 433 U.S. at 14 n. 9, 97 S.Ct. 2476. Thus, the search of the second ammo box was constitutionally permissible under exigent circumstances.

### RECOMMENDATION

It is therefore recommended that defendant's motion to suppress physical evidence obtained during the search of 2499 Jonquil as well as any statements made by defendant be denied for the reasons set forth above.

the markings on the outside of the boxes. "Not all containers and packages found by police during the course of search will deserve the full protection of the Fourth Amendment ... some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." *Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), *overruled by California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Although *Sanders* has been overruled, the logic of footnote 13 has survived. *See United States v. Villarreal*, 963 F.2d 770, 775 (5th Cir.1992); *United States v. Donnes*, 947 F.2d 1430, 1437 (10th Cir.1991). Upon discovering the clearly marked ammunition boxes, the agents could have opened the boxes if the labels made it immediately apparent that the boxes contained contraband or evidence of a crime. *See United States v. Morgan*, 744 F.2d 1215, 1222 (6th Cir.1984). The government, however, presented no proof that .9mm subsonic ammunition was contraband or evidence of a crime coming within the *Sanders* footnote 13 exception.