Filed 9/29/23  P. v. Scott CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN MORDECAI SCOTT VI,<br><br>    Defendant and Appellant. | G061370<br><br>(Super. Ct. No. 14HF2171)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed as modified.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Following a bench trial, appellant John Mordecai Scott VI was convicted of multiple child sex crimes. He contends reversal is required because the police violated his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)) and failed to preserve exculpatory evidence. We agree with his *Miranda* contention, but find the error harmless. Other than to correct an undisputed error in the abstract of judgment, we affirm in all respects.

FACTS

Appellant was a piano teacher in Orange County for many years. He also dabbled in fashion photography from time to time. In 1999, and then again in 2006 and 2007, he was investigated for taking salacious photographs of teenage girls. However, no charges were filed against him until 2014, after one of his piano students – Sabrina O. – accused him of taking sexually revealing photos of her during her lessons.

Sabrina took piano lessons from appellant when she was 10 years old. Some of the lessons occurred at appellant's residence, others took place at a music studio he rented. During the lessons, appellant liked to take Sabrina's picture. Most of the pictures were wholesome, but sometimes appellant directed Sabrina to strike sexually suggestive poses, and other times he had her adjust her clothing so that it revealed her breasts, buttocks or vagina. He also photographed her while she was lying on his bed and showed her pictures of semi-naked women on his phone.

Appellant made it clear to Sabrina that he did not want her to tell anyone about this but Sabrina eventually told her mother, and she reported appellant to the police. When interviewed by investigators on August 6, 2014, Sabrina provided detailed information about how appellant photographed her in sexually revealing positions and showed her pornographic material.

Two days after Sabrina's interview, police executed a search warrant at appellant's apartment in Lake Forest. On appellant's computer, investigators found thousands of images of child pornography that had been downloaded from the internet.

2

The computer also contained photos of Sabrina and other girls that appellant had given piano lessons over the years. Some of those images had been photoshopped to make it look like the girls were engaging in sexual activity with other people.

During the search of appellant's apartment, investigators questioned him about the photos he took of his students. While admitting some of the photos may have been inappropriate, appellant insisted his students liked being photographed, and he did not do anything illegal. However, after the police spoke with more of his students, appellant was charged with committing 27 sex crimes involving 9 different victims between 1996 and 2014.[1]

The case was tried to a court. Like Sabrina, Madison R. testified appellant liked to take pictures of her during her piano lessons, when she was in her early teens. Some of the pictures showed Madison sticking out her tongue, puckering her lips and doing the splits. Besides taking Madison's picture, appellant also talked to her about pubic hair and touched her thighs and underwear on occasion. Sometimes he made her spread her legs for him under the guise of doing a timing exercise with a metronome.

Julie L., who was also in her early teens when she started taking piano lessons from appellant, testified to similar treatment. She said that in addition to taking provocative photographs of her, appellant touched her vaginal area on multiple occasions, both over and underneath her underwear. He also showed her how to masturbate by rubbing her thumb against her vagina. Appellant told Julie her future husband would thank him for showing her how to pleasure herself.

Martina M. testified she took piano lessons from appellant in 2007, when she was 11 years old. During some of the lessons, appellant showed her pictures of naked women on his computer. Once he asked her to put on a leopard print bikini so he could photograph her in it, but she refused.

---

[1] Some of the victims came forward after the district attorney's office issued a press release about appellant's alleged misconduct with his students.

Allison C. was 10 years old when she started taking piano lessons from appellant in 1997. She testified the lessons made her uncomfortable because appellant showed her pornography and liked to take her picture. During the picture taking, appellant directed her to pose like a model and convinced her to remove her top for some of the shots. Claiming he was a doctor, he also spread her legs apart and touched her vagina with a pencil on one occasion.

Makaila H. testified she took piano lessons from appellant from the age of seven to eleven. Because appellant was a trusted friend of her family, the lessons usually took place at her house without any supervision. That left her exposed to appellant's lewd behavior, which included unwanted touching and crude sexual remarks. Appellant also had a habit of following her into the bathroom and showing her pornographic magazines. During one of the lessons, Makaila tried to hide some of the magazines so she could show them to her mother. But right after appellant left the house, he returned in a panic and found them, much to Makaila's chagrin.

Appellant's lessons with Sydney K. were also laced with crude sexual remarks and unwanted touching, as well as inappropriate picture taking. He also exposed her to pornographic photos on his phone. Although appellant would act embarrassed by the photos, Sydney suspected he was just looking for a reaction from her and seeing how much he could get away with. She was 15 years old at the time.

Allison T., the last named victim, testified appellant pulled her legs apart while having her do a timing exercise during her piano lessons when she was 13 years old. He also touched her breasts while trying to adjust her bra one time. On another occasion, he pulled down her underwear and told her she was "developing nicely" while taking her picture.

In addition to all this evidence, the prosecution presented evidence of uncharged misconduct from Shannon G., who went to appellant's house for a fashion shoot one day in 1999 when she was 15 years old. During the shoot, appellant lowered

4

his pants and told Shannon to massage his penis, but she refused. Then he showed her pictures of naked women on his computer. One of the pictures was of Shannon's older sister, whom appellant had previously photographed. Appellant told Shannon she would have to pose like her sister if she wanted to become a model, so she gave in and let appellant photograph her wearing only the top half of a bikini. As he was doing so, he touched Shannon's "private area" and asked about her sex life. He also told her he could help her make money in the porn industry.

Appellant did not testify at trial, but his ex-wife took the stand and said she never had any reason to suspect appellant was engaging in inappropriate conduct with any of his students. The defense also presented testimony from a psychologist who said that children are susceptible to creating false memories if they are subjected to suggestive questioning by adults.

In the end, the trial court found appellant guilty of 15 counts of lewd conduct with a child under the age of 14, 5 counts of lewd conduct with a child aged 14 or 15, 2 counts of distributing pornography to a minor, and 1 count each of using a minor to make child pornography, possessing child pornography, and misdemeanor child annoyance. (Pen. Code, §§ 288, subds. (a) & (c)(1); 288.2, subd. (a); 311.4, subd. (a); 311.11, subd. (a); 647.6.) In addition, the court found true allegations that appellant committed sex crimes against multiple victims and that he used obscene material during some of his offenses. (*Id*., § 667.61, subds. (b) & (e).) It sentenced appellant to 100 years to life in prison for his crimes.

DISCUSSION

*Miranda Issue*

Before trial, appellant moved to suppress the interview statements he made to investigators while his apartment was being searched on August 8, 2014. He argued suppression was mandated because the investigators failed to advise him of his *Miranda* rights. However, the trial court denied the motion on the ground appellant was not in

5

custody during the interview. Appellant contends that ruling was erroneous, and we agree. But we find the admission of his interview statements was harmless beyond a reasonable doubt in light of the entire record of the case.

At the *Miranda* hearing, Sergeant Sandra Longnecker of the Orange County Sheriff's Department testified to the circumstances surrounding appellant's interview and arrest. She was part of a multi-agency team of about 11 law enforcement officers who arrived at appellant's apartment building at 7:00 a.m. to execute the search warrant that had been issued in the wake of Sabrina's allegations.

According to Longnecker, appellant lived in a one-bedroom apartment on the second floor of the building. When no one responded to the officers' demand for entrance, seven of them forcibly breached the door with a handheld battering ram. Once inside, they contacted appellant and secured the premises. Then, Longnecker and her partner Monica Abend from the Department of Homeland Security went inside.

By that time, appellant, who had been sleeping in his underwear prior to the officers' arrival, was wearing pants and a t-shirt in the living room. Longnecker asked if he would be willing to talk, and he said yes. When she suggested they do so out on his balcony, he accompanied her outside. Appellant took a seat in a chair that was facing his apartment, and Longnecker and Abend sat opposite of him. The officers were not positioned directly in appellant's path to the apartment, but in order to get back inside, he would have had to walk right beside them.

While they were getting situated out on the balcony, the search team, which consisted of four or five officers, was searching and photographing appellant's apartment. They were also collecting all of his electronic devices and moving them into the living room for a preliminary analysis. As part of that analysis, a forensic specialist on the search team began reviewing the contents of appellant's computers and cameras. He also started downloading the contents of appellant's phone onto a police file.

6

Meanwhile, appellant's balcony interrogation was just getting started. Unlike the officers on the search team, Longnecker and Abend were unarmed and out of uniform. They did not reveal the interview – which ended up lasting two hours and twenty four minutes – was being video recorded by a hidden camera that Longnecker had set up prior to appellant's arrival on the balcony.

At the outset of the interview, Longnecker advised appellant he was not under arrest and free to go. She also told him that she knew this was not his "first rodeo," seeing that he had previously been investigated for sexual misconduct involving underage victims. Appellant acknowledged the police had searched his residence in 1999 and 2007, but when Longnecker asked if he knew why the police were searching his apartment this time, he said he had no idea.

Longnecker explained Sabrina O. had accused him of taking inappropriate photographs of her during her piano lessons. Appellant admitted he was an avid photographer and had taken pictures of Sabrina, but he said they were just standard portrait shots. He denied taking any sexually oriented photos of her, or any of his other students.

Longnecker told appellant that in addition to searching his apartment, they were going to be searching all of the studios where he had given lessons. She also asked appellant about the various laptop computers he had at his apartment. When appellant said some of those computers did not belong to him, Longnecker went into the apartment to retrieve them.

While she was gone, Abend asked appellant if he was feeling okay. He said he was but that he usually takes antacid pills in the morning. Abend asked if he wanted them now, and he said yes. He also said he was thirsty, so Abend said they would get him his pills and a glass of water.

When Longnecker returned to the balcony, Abend told her what appellant wanted, and she went back into the apartment to get it. This surprised appellant because

7

he thought he could get the pills himself. However, when he asked if he could do so, Abend answered, "No. Just you know, hang out right here." "[I]f you need anything just let us know. Um, it's just for officer safety purposes, people are walkin' around. We just don't want you walking freely. But that's the only reason. It's just for our safety. Okay? But if you need anything just let us know. If you need to go [to] the bathroom, if you need a drink of water, we'll . . . try [to] help you out." Appellant replied "okay" and nervously looked around the balcony. Then he asked for a long-sleeved shirt, which was provided to him along with his pills and a glass of water.

The officers then turned the conversation back to Sabrina's allegations. Appellant asserted that Sabrina liked it when he took her picture and that he seldom told her how to pose. Rather, she usually just did "her own thing" because she was very comfortable in front of the camera and very fashion savvy. Appellant did admit, though, that he sometimes took "cutesy" pictures of Sabrina and that he once photographed her looking longingly at a lollipop. However, he said he did not take many shots in that vein.

Longnecker told appellant she was not trying to judge him, but she wanted to know if he was a "Christian man" and how often he went to church. Appellant said he attended church as often as possible. When Longnecker asked him if he had any addiction issues, he said he was active in AA and had "a problem with pornography." He also said he had a compulsion for collecting photographs, although he rarely went back and looked at them once he downloaded them onto his computer.

Longnecker pressed appellant on that issue. In response to her accusation that he looked at the photos for his sexual pleasure, appellant admitted he had a "student folder" on his computer that contained photos of Sabrina posing on his bed. Appellant tried to explain the bed shots were Sabrina's idea, and there was nothing indecent about them, but Longnecker was skeptical. She told appellant she knew what kind of pictures he had taken of Sabrina, and she was sure they were going to find child pornography in his apartment.

8

When appellant begged to differ, Abend told him, "[W]e have a . . . computer forensic agent with us, and so we're gonna be looking through your computers and your camera and everything." Nevertheless, appellant continued to deny any wrongdoing, even after Longnecker told him that Sabrina had accused him of taking some pictures of her with her vagina exposed. Appellant said he was surprised by that accusation and that he had never taken any "porn type pictures" of Sabrina. He also denied showing her, or any of his other students, any sort of pornography on his computer.

At that point, Longnecker brought up the prior instances in which appellant had been investigated for sexual misconduct. She said he had a history of taking risqué photos of teenage girls for his sexual pleasure, and his photos of Sabrina fit his "M.O." in that regard. When appellant disagreed, Longnecker told him that, being "a Christian man . . . in recovery[,]" it was time for him to start owning up to what he had done.

Appellant continued to insist he had done nothing illegal. He also said he had never gotten back some of the computer equipment that was seized from him when the police investigated him back in 2007. Even though that investigation did not lead to any criminal charges, Longnecker told appellant he wasn't going to get that equipment back any time soon because of Sabrina's allegations. Longnecker also said she was going to have to discuss those allegations with appellant's adult son, which made appellant uncomfortable.

Longnecker then asked appellant if he was attracted to 14 and 15 year old prepubescent girls. Appellant said "they look cute" sometimes, but he prefers women in their 30's or 40's. He said he would not be "turned on" by the thought of an underage girl dressing up to look older than she really was.

Dubious of this, Longnecker asked appellant for the password for his phone and went into his apartment. While she was gone, appellant asked Abend if he could use the bathroom. Abend relayed that request to Longnecker when she returned to the

9

balcony. Then the two of them walked into the apartment with appellant, and Longnecker notified the search team that appellant needed to take a "potty break." Longnecker could not recall whether anyone from the team accompanied appellant to the bathroom, or he simply walked there on his own.

When appellant was done using the bathroom, he walked back out onto the balcony with Longnecker and Abend, and the interview resumed. They asked him about his computers and his camera, and he admitted he had a "couple hundred" pictures of Sabrina on his computer. He said most of them were "good pictures," meaning decent in nature. But in some of them, Sabrina's poses were "kinda sexy" and "a little bit too old" for her. Asked if he found those poses attractive, appellant said, "No. Not really." He claimed he simply got carried away taking Sabrina's picture because he liked taking pictures so much, and Sabrina liked having her picture taken and pretending to be a model.

Longnecker would have none of it. She told appellant the search team had already found pictures of Sabrina on his computer with her butt and vagina exposed. When appellant insisted he never took any such pictures, Longnecker replied, "Oh, yes [you] did sir. I just looked at 'em. I'm looking at her labia." Appellant said he had no recollection of that, but Longnecker told him, "Your recollection doesn't mean anything. Okay." "I [saw Sabrina's vagina exposed] in the picture. I just looked at it. Do I need to show it [to] you?" When appellant claimed Sabrina wanted to pose like that, Longnecker retorted, "No she didn't. You're lying. A ten year old doesn't do that."

Appellant admitted he may have "crossed the line" by taking so many pictures of Sabrina because he was being paid to teach her the piano, not photograph her. However, he claimed he did not take any pictures of Sabrina's vagina. And while he conceded some of the pictures he took may have been in poor taste, he insisted they were not the product of any intentional design on his part. Rather, he just got caught up in the moment because Sabrina was "playing around" and "teasing" him. He also claimed

10

Sabrina had told him that she had seen pornographic pictures while surfing the internet on her own computer.

At that point, Longnecker went back into the apartment, and appellant told Abend that a handyman was scheduled to come over to his apartment that morning to fix his plumbing. He wanted to know if he could call him to cancel the appointment. Abend relayed this request to Longnecker when she returned to the balcony. Longnecker told appellant he could not use his phone at the moment because the search team was still examining it, so no call was made, and the questioning resumed.

Abend asked appellant why he took the risk of photographing Sabrina at all, given the fact he had previously been investigated for sexual misconduct with other girls. Appellant said that was "the million dollar question . . . kinda stupid huh?" Abend accused appellant of being evasive. She said they had "hard evidence" of criminality on his computer, and there was "no way [for him] to twist it around."

Longnecker then asked appellant about a video he had recently taken of Sabrina while he was having her keep beat with a metronome during one of their lessons. Longnecker accused appellant of telling Sabrina to spread her legs during the exercise, but appellant denied it, saying Sabrina did that all on her own. In response, Longnecker told him, "No. I just watched the video." "I can hear you directing her." Then she leaned forward in her chair and told appellant, "I'm done bull shittin' with you, honey, okay?" That led appellant to admit that if someone had taken a video like that of his son when he was young, he probably would not have liked it.

However, on the whole, appellant continued to defend his actions. When he tried to explain the metronome exercise was for Sabrina's benefit, Longnecker told him, "No. . . . you do it because you're sexually driven with collecting videos and pictures" and "[y]ou have an addiction to porn. And then you're making child pornography in your house." Appellant replied, "[Y]ou're putting words in my mouth, and I'm not gonna agree [to] that." He also denied showing Sabrina any pornographic

11

pictures, but again Longnecker insisted he was lying. She told him, "I get it. You're trying to protect yourself. You lied, [but] now we're finding all this" child pornography on your computer.

When appellant continued to maintain his innocence, the following exchange occurred:

"LONGNECKER: I have pictures of [Sabrina] at the studio like this (showing him). You don't think that's illegal? Where it's focused on her vagina?

"[APPELLANT]: It's not focusing. Can you keep your voice down.

"LONGNECKER: Sorry.

"ABEND: . . . [I]f I walked in and saw my child on the ground like this . . . and a camera . . . I would fuckin' kill you."

Longnecker also accused appellant of robbing Sabrina of her innocence and having no concern for her well-being. When appellant said he was sorry for "getting carried away" with his picture taking, Longnecker told him, "Now I'm hearing some empathy."

Longnecker then asked appellant if he had taken any pictures of Julie L. during her lessons. Appellant said not that many, and none that were "racy" or "inappropriate" because she is "very conservative." Again, Longnecker did not believe him. When appellant denied her accusation that he had taken a picture of Julie with her legs spread apart, she insisted, "Yes you did. I have it. I saw it." She also told appellant they were going to find pictures of other girls he had photographed. Appellant admitted he had taken some pictures of Madison R. during her lessons, but he said they were not like the pictures he had taken of Sabrina.

Longnecker then asked appellant if there was anyone he wanted them to call for him. Appellant said his AA sponsor and the handyman he had alluded to earlier. He denied taking pictures of his students for sexual gratification, and he disputed Longnecker's claim that the pictures were pornographic in nature. However, Longnecker

12

told appellant that things did not look good for him because "all of the cases line up. They're all the same. The girls all said the same thing. And now we're finding more and more girls on your computer where you have taken pictures that are not appropriate."

After that, appellant asked Longnecker and Abend if he could get some toast and call his lawyer. They brought him some toast, but because the search team was still downloading the contents of his phone, they did not allow him to call his attorney. Instead, they arrested him and took him into custody.

In ruling on appellant's motion to suppress his interview statements, the trial court described the custody issue as a "bar question on steroids," meaning it was not susceptible of a simple or straightforward answer. The court noted that, on the one hand, the police entered appellant's apartment in an alarming fashion by breaking down his door while he was asleep, and they questioned him extensively while searching his personal belongings. But, on the other hand, appellant was not physically restrained, he was told he was free to leave, and the tone of the interview was lowkey.

Ultimately, the trial court ruled appellant was not in custody for purposes of *Miranda* because, had he wanted to, he could have just walked away from his interrogators and gone to Starbucks or a friend's house. Therefore, the court denied his suppression motion and allowed the prosecution to admit the interview into evidence, at least the vast majority of it. The court did find that the questioning should have ceased when appellant asked if he could call his lawyer. However, this was at the very end of the interview, and nothing of consequence was discussed after that point. Therefore, the court's decision to exclude everything after appellant's request to call his lawyer did not benefit him in any meaningful way.

In reviewing a trial court's *Miranda* ruling, we accept its """"resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally

13

obtained.'"'" [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review" to the question of whether the police acted in accordance with *Miranda*. (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

The *Miranda* decision was designed to protect persons suspected of criminal activity from the inherently coercive circumstances attendant police interrogations. (*Miranda, supra*, 384 U.S. at p. 444.) By requiring the police to inform a suspect of his right to remain silent and consult with an attorney, the high court sought to implement the constitutional privilege against self-incrimination and ensure "the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." (*Id*. at p. 469; accord, *Dickerson v. United States* (2000) 530 U.S. 428 [reaffirming that *Miranda* warnings are a constitutionally based component of our national culture allowing suspects the opportunity to exercise their Fifth Amendment rights when facing the pressures associated with police interrogation].)

However, "police officers are not required to administer *Miranda* warnings to everyone whom they question." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) "*Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" (*Ibid*.) In deciding the custody issue, we do not consider the "'subjective views harbored by either the interrogating officers or the person being questioned.' [Citation.]" (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 663.) Rather, we must assess the objective circumstances surrounding the interrogation to determine whether a reasonable person in the suspect's position would have felt free to terminate the questioning and walk away. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112–113.) This turns on whether the defendant was formally arrested or his freedom of movement was restrained to the degree associated with a formal arrest. (*Id*. at p. 465; *Stansbury v. California* (1994) 511 U.S. 318, 322; *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

14

From the state's perspective, there are three main factors that weigh against a finding of custody in this case: 1) The interview took place at appellant's apartment, not a police station, 2) at the outset of the interview, Longnecker told appellant he was not under arrest and free to leave; and 3) the interview was conducted in a calm fashion. Even when those factors are present however, the totality of the circumstances surrounding a police interview may be so restrictive that a reasonable person in the suspect's position would feel not feel free to just up and walk away from his interrogators. In that situation, the suspect will be deemed to be in custody, triggering the need for a *Miranda* advisement. (See, e.g., *United States v. Craighead* (9th Cir. 2008) 539 F.3d 1073, 1083 (*Craighead*) [telling a suspect he is free to leave during an interview in his own home is a "hollow right" if his freedom is effectively restricted due to a dominating police presence]; *United States v. Revels* (10th Cir. 2007) 510 F.3d 1269, 1275 [*Miranda* warnings were required because the police were "unequivocally in control of the circumstances both before and during" the questioning of the suspect in her own home]; *People v. Saldana* (2018) 19 Cal.App.5th 432, 458 [the police cannot avoid the *Miranda* rules by telling a suspect he is not under arrest and can leave at any time if their contemporaneous conduct effectively nullifies that advice].)

In *Craighead*, the defendant was a member of the U.S. Air Force who was under investigation for possessing child pornography. When the police executed a search warrant at his residence, eight law enforcement officers from three different agencies were present, as well as his commanding sergeant. (*Craighead, supra*, 539 F.3d at p. 1078.) Two of the officers informed the defendant he was not under arrest and free to leave. (*Ibid*.) Then they escorted him to a storage room at the back of his house and questioned for 20-30 minutes with the door closed and without advising him of his *Miranda* rights. (*Ibid*.) During the interview, the officers did not make any threats or promises to the defendant, nor was he physically restrained. (*Id*. at pp. 1078-1079.) But one of the officers, who was armed, was standing near the door. (*Ibid*.) The trial court

15

denied the defendant's motion to suppress his interview statements on the basis the interview was noncustodial. (*Id*. at p. 1080.) The Ninth Circuit reversed and remanded for further proceedings. (*Id*. at p. 1089.)

In so doing, the *Craighead* court recognized "courts have generally been less likely to find an interrogation in the suspect's home was custodial in nature. [Citations.]" (*Craighead, supra*, 539 F.3d at p. 1083.) Nevertheless, a home interrogation will be deemed custodial if the overall circumstances "turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" (*Ibid*.) And one of the circumstances that "goes a long way towards making a suspect's home a police-dominated atmosphere" is "the presence of a large number of visibly armed law enforcement officers[.]" (*Id*. at p. 1085.)

Appellant here was in his home but so were about 11 officers from a variety of law enforcement agencies, including the F.B.I., the Department of Homeland Security, the Orange County Sheriff's Department, and local police. This "large police presence" entered by way of a battering ram, and at the outset of their interview with appellant, Longnecker and Abend made it clear to him that they were part of a multi-jurisdictional task force that was investigating child exploitation crimes. Although they were not in uniform, the trial court observed from viewing pictures of the scene that the officers "doing the searching were definitely in uniform; vests, 'Police' written all over it, guns, everything throughout." The court also noted that by breaking down appellant's door with a battering ram at seven o'clock in the morning, the officers' method of entry, although legal, was enough to "shock the nervous system" of the average person.

As respondent correctly notes, two or three of the seven officers on the initial entry team left appellant's apartment after it was secured. However, Longnecker and Abend went inside shortly after that, and a couple more officers remained on the perimeter of the apartment for support. And while appellant was being interviewed on the balcony by Longnecker and Abend, the search team was examining the contents of

16

his electronic devices right there in the apartment. To characterize this setting as being anything other than "police dominated" seems to us a stretch.

As for the fact appellant was told he was not under arrest and free to leave, the *Craighead* court determined such a recitation "does not render an interrogation non-custodial *per se*. We must consider the delivery of these statements within the context of the scene as a whole. [Citation.]" (*Craighead, supra*, 539 F.3d at p. 1088.) The "*Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether 'a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave.' [Citation.]" (*Ibid.*)

The *Craighead* court determined that, despite being told he could do so, a reasonable person in the defendant's situation in that case would not have felt free to leave due to the fact his house was being searched by officers from multiple law enforcement agencies, one of the officers appeared to be guarding the door in the room where he was interviewed, and that room was set off from the more comfortable locations of the house, such as the kitchen or living room. (*Craighead, supra*, 539 F.3d at pp. 1088-1089.) In addition, the searching officers were accompanied by the defendant's commanding sergeant, "a superior with authority over him." (*Id*. at p. 1079.)[2]

Although multiple agencies were involved in the search of appellant's apartment, no one from the military was there, and no one guarded the balcony to make sure he did not leave during the interview. However, Longnecker and Abend were sitting very close to appellant on the balcony, which was set off from the rest of the apartment. And when appellant asked if he could go into the kitchen and retrieve his medicine, he was told to stay put for officer safety. "You're free to leave at any time but you cannot go to your kitchen for medicine," is, at best, a mixed message.

---

[2] The sergeant was actually at the scene to provide support for the defendant, but the defendant was not aware of that while he was being interviewed. (*Craighead, supra*, 539 F.3d at p. 1079.)

17

*Craighead* recognized that "when law enforcement agents conduct an in-home interrogation while conducting a lawful search of the home, physical control of the suspect will [often] be necessary to preserve evidence and protect the safety of the agents." (*Craighead, supra*, 539 F.3d at p. 1086.) But, "The fact that these precautions may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." (*Ibid*.)

When appellant was told he could not enter his apartment to retrieve his medicine he was visibly surprised, which is understandable because just a few minutes before Longnecker had advised him that he was not under arrest and free to leave. The truth of that advisement was undermined by the fact that when appellant asked to go into his own kitchen, he was told to stay put on the balcony and told he was not allowed to walk around freely inside the apartment. Despite his repeated requests, appellant was not allowed to use his phone during the interview either. Even though there were legitimate reasons for restricting appellant's movement and phone access, we cannot lightly dismiss the impact those restrictions would have had on a reasonable perception of his custodial status.

That brings us to the nature of the questioning itself. We agree with respondent that the interview was calm and professional for the most part. But Longnecker did apologize to appellant for raising her voice at one point, and at another juncture she leaned forward in her chair and bluntly told appellant to his face that she was "done bull shittin'" with him. She also repeatedly accused appellant of lying and exerted strong psychological pressure on him when she invoked his Christian faith in urging him to own up to what he had done. The fact Longnecker was polite and nonthreatening during other parts of the interview does not negate the possibly coercive effect of these moments. (See *People v. Saldana, supra,* 19 Cal.App.5th at p. 460 [recognizing the coercive effect of interrogation techniques that play on the defendant's moral sensibilities]; *People v. Adams* (1983) 143 Cal.App.3d 970, 989, disapproved on other

grounds in *People v. Hill* (1992) 3 Cal.4th 959, 995, fn. 3 ["Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say."].)

Appellant also faced considerable pressure from Abend, who told him straight up that she would "fuckin' kill" him if she ever caught him photographing her daughter the same way he had photographed Sabrina. The use of such aggressive language, while it may be an effective and allowable technique, is still a "highly significant" factor in the custody equation. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) Respondent contends Abend was merely trying to reason with appellant, not threaten him. But even if that was her subjective intention, her actual words signaled such deep disgust for appellant's actions that it is unlikely a reasonable person in his situation would have believed that she was going to let him just get up and walk away if he tried to do so.

Respondent correctly points out that, standing alone, police accusations of wrongdoing are typically not sufficient to transform a noncustodial interview into a custodial one. (*Stansbury v. California, supra,* 511 U.S. at p. 325 ["Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue"].) But in this case, the interrogating officers did not simply accuse appellant of taking sexually graphic photos of Sabrina, they actually confronted him with such photos. Those photos were important in terms of corroborating Sabrina's allegations. They signaled to appellant that this was not simply a he-said/she-said case and that the police had the ability to back up Sabrina's allegations with highly incriminating physical evidence. They represented a significant change in circumstance since the "you are free to leave" beginning of the interview. This also weighs in favor of a finding that appellant was in custody. (*United States v. Guillen* (10th Cir. 2021) 995 F.3d 1095, 1110; *United States v. Rith* (10th Cir. 1999) 164 F.3d 1323, 1332.)

19

So does the fact appellant's interview lasted nearly two and a half hours and culminated with him being arrested.  (*Yarborough v. Alvarado, supra,* 541 U.S. at p. 665 [factor favoring custody finding was that defendant' interview lasted two hours]; *People v. Aguilera, supra,* 51 Cal.App.4th at p. 1162.)  Even prior to appellant's formal arrest, a reasonable person in his position would have felt considerable restriction on his or her freedom of movement.  Rather than feeling free to mosey on out, most people would have expected to be met by an immediate showing of police authority if they tried to leave the premises.

For all of these reasons, we conclude appellant was in custody when he was interviewed on the balcony.  Because the police did not read him his *Miranda* rights, the trial court erred in admitting his interview statements into evidence.  However, for reasons we now explain, we find that error was harmless under the circumstances presented.

"The erroneous admission of a defendant's statements obtained in violation of the [*Miranda*] is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18.  [Citations.]  That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  [Citation.]" (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.)  That is to say, the error must have been relatively unimportant as compared to the other evidence of the defendant's guilt.  (*People v. Neal* (2003) 31 Cal.4th 63, 86.)  Indeed, we must be convinced the verdict was "surely unattributable" to the erroneous admission of the defendant's statements.  (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.)

Although that is a demanding standard, we believe it is satisfied in this case for several reasons.  For starters, appellant's interview statements were not that incriminating.  Granted, he lied about the type of pictures he took of Sabrina – a fact the prosecutor brought up in her closing argument – and he conceded some of the pictures may have been inappropriate.  However, he denied he was trying to exploit Sabrina for

20

his own sexual gratification. Instead of going along with his interrogators' allegations of wrongdoing, appellant maintained he simply got "carried away" with the picture taking because it was something that both he and Sabrina enjoyed.

Having reviewed the video recording of appellant's interview, the trial judge fully understood this dynamic. In fact, most of appellant's statements were so innocuous the judge remarked, "I'm not even sure why the People even need this video," which he described at various points as being "meh" and/or "eh," meaning not that big a deal to him. Whereas a jury may not have been able to recognize the evidentiary limitations of appellant's statements, this experienced trial judge – sitting as the trier of fact – clearly understood they were not a particularly important aspect of the prosecution's case.

All of the alleged victims testified appellant took advantage of them in a similar fashion, and their testimony was corroborated by the photographic evidence that was discovered at appellant's apartment. That evidence included a large stash of child pornography, as well as sexually graphic pictures of Sabrina. It also revealed that appellant had been photoshopping the faces of his students onto pornographic images to make it look like they were engaging in sexual activity with other people. More than anything appellant admitted in his police interview, this evidence proved he acted with lewd and lascivious intent when he made his students pose for them and took their picture.

In downplaying the strength of the prosecution's case, appellant points out that Sydney K. did not consider herself to be a "victim" of sexual abuse, and Allison C.'s testimony regarding the circumstances surrounding her abuse was refuted in some respects. For example, Allison testified that appellant's ex-wife unsuccessfully tried to open a door to see what was going between her and appellant during one of her lessons, but appellant's ex-wife denied that. However, this minor detail was unrelated to appellant's actual lewd behavior, which Allison described in specific terms. Even if the

21

ex-wife were believed, it would not render Allison's testimony unreliable as a whole. (See *People v. Jones* (1990) 51 Cal.3d 294 [the inability of a child victim to recall the precise circumstances under which she was molested is not fatal to a criminal conviction for lewd and lascivious conduct with a minor].)

Taken together, the victims' testimony and the physical evidence found at appellant's apartment, were powerfully incriminating. Appellant's tepid interview statements were not only relatively unimportant in comparison, we are confident they did not contribute to the trial court's verdict in any meaningful way. Their admission into evidence is not cause for reversal.

*Failure to Preserve Evidence*

During the pretrial proceedings, appellant also moved to dismiss the charges related to Allison C. and three other victims on the ground the state failed to preserve exculpatory evidence in violation of *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*). The trial court denied the motion, and appellant does not dispute the propriety of that ruling as to three of the four victims it concerned. However, he contends the motion should have been granted as to Allison C. We disagree.

Appellant's claim is based on the state's failure to preserve evidence it seized while searching his residence in 1999. That search was prompted by allegations that were made by Shannon G., the uncharged victim in this case. In addition, appellant was investigated in 2006 and 2007, for taking illicit photos of girls other than Allison C. However, in 2010, investigators determined there was insufficient evidence to charge appellant with any crimes, so the case against him was closed. Sometime thereafter, the evidence seized from appellant's residence in 1999 was either lost or destroyed by the Orange County Sheriff's Department.

In 2014, the case was reopened in light of Sabrina's allegations. The renewed investigation led to other victims coming forward, including Allison C. She

22

alleged appellant showed her pornography and touched her vagina while she was taking piano lessons from him in 1997. She also claimed appellant took pictures of her while directing her to pose with her top off. Those allegations gave rise to two of the lewd and lascivious counts against appellant in this case.

In his *Trombetta*/*Youngblood* motion, appellant claimed the state's failure to preserve the evidence seized during the search of his residence in 1999 unfairly hampered his ability to defend against those two charges. Appellant theorized that evidence must have been exculpatory because he was not charged with any crimes at that time, and the case against him was closed in 2010. So, by allowing that evidence to be lost or destroyed, the state acted in bad faith and undermined his right to a fair trial.

The trial court ruled it was logical to presume the evidence seized from appellant's residence in 1999 was destroyed after his case was closed in 2010. The court found there was nothing "devious or unusual" about that because the state did not have enough evidence to charge appellant at that time. In response to appellant's assertion the state should have preserved that evidence for possible use in future cases, the court determined that was not required because investigators did not have a "crystal ball" that allowed them to see how events were going to unfold. In fact, they were not even aware Allison C. was a potential victim until 2014. Therefore, the court ruled the state was not remiss for failing to preserve evidence that was discovered at appellant's residence 15 years before then.

In *Trombetta*, the United States Supreme Court ruled law enforcement officials have a duty under the due process clause of the Fourteenth Amendment to preserve evidence "that might be expected to play a significant role in the suspect's defense." (*Trombetta, supra*, 467 U.S. at p. 488, fn. omitted.) However, that duty applies only if the evidence has readily apparent exculpatory value. (*Id.* at pp. 488-489.)

"The state's responsibility is further limited when the defendant challenges the failure to preserve evidence 'of which no more can be said than that it could have

23

been subjected to tests' that might have helped the defense. [Citation.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 41–42.) In that situation, where the subject evidence is only potentially useful, *Youngblood* teaches that no due process violation will be found unless the state acted in bad faith by failing to preserve it. (*Youngblood, supra*, 488 U.S. at p. 58.)

Both the duty to preserve evidence and the issue of bad faith focus on what investigators knew at the time the evidence was destroyed. (*Trombetta, supra*, 467 U.S. at p. 489; *Youngblood, supra*, 488 U.S. at p. 56, fn. *.) It does not turn on "conjectural possibilities developed months or years after the evidence is no longer available" because that would place an "inordinate burden on the state to preserve evidence." (*People v. Greathouse* (Col. 1987) 742 P.2d 334, 338.)

Indeed, *Youngblood* makes clear the police do not have "an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (*Youngblood, supra*, 488 U.S. at p. 58; accord, *People v. Wallace* (2008) 44 Cal.4th 1032, 1083.) Consequently, they need not retain material found in the course of investigating a crime simply because it "could conceivably have some evidentiary value in the future." (*People v. Holmes* (Ill. 1990) 552 N.E.2d 763, 770.)

In this case, it is certainly plausible that the evidence obtained during the search of appellant's residence in 1999 could have benefited him in terms of defending the charges involving Allison C. For example, if it turned out that evidence did not include any photos of Allison, appellant could have used that fact to rebut her claim that he took illicit pictures of her in 1997. The absence of such photos would not have served as conclusive proof that appellant never took Allison's picture, of course, but it could have bolstered his case marginally in regard to that issue.

Nevertheless, when the search evidence was destroyed in the wake of the state's decision not to charge appellant in 2010, Allison was not on the state's radar

screen as a potential victim. The investigations preceding 2010 involved different girls, and Allison did not become known to the police until she came forward in 2014. Prior to that time, it would not have been reasonably apparent to investigators that any of the evidence seized from appellant's home in 1999 was exculpatory as to the future charges involving Allison. Therefore, the retention of that evidence was not required under *Trombetta* or *Youngblood*. Appellant has failed to establish the requisite materiality or bad faith required to establish a due process violation under those decisions.

*Abstract of Judgment*

Lastly, the parties agree the abstract of judgment must be amended to delete a criminal assessment fee of $750. Because the trial judge did not actually impose such a fee at the time of sentencing, we will modify the judgment accordingly. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [appellate courts have the authority to correct errors in the abstract of judgment when it differs from the trial court's oral pronouncement of the defendant's sentence].)

DISPOSITION

The judgment is modified to delete the $750 criminal assessment fee in the abstract of judgment, and the clerk of the superior court is directed to prepare a corrected abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

25